Submitted November 30, 2010, affirmed June 15, 2011

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

JACK MERLE WRAY, JR.,
*Defendant-Appellant.*

Múltnomah County Circuit Court
080130068; A141581

259 P3d 972

Peter Gartlan, Chief Defender, and Zachary Lovett Mazer, Deputy Public Defender, Office of Public Defense Services, filed the brief for appellant.

John R. Kroger, Attorney General, Jerome Lidz, Solicitor General, and Michael R. Washington, Senior Assistant Attorney General, filed the brief for respondent.

Before Sercombe, Presiding Judge, and Brewer, Chief Judge, and Landau, Judge pro tempore.

SERCOMBE, P. J.

**SERCOMBE, P. J.**

Defendant appeals a judgment of conviction for, among other things, criminal mischief in the first degree, ORS 164.365. He assigns error to the trial court's denial of his motion for judgment of acquittal on that charge, contending that there was insufficient evidence that the property he damaged was "used in direct service to the public" within the meaning of ORS 164.365(1)(a)(E).[1] We conclude that the evidence was sufficient to establish that defendant damaged property "used in direct service to the public" and, accordingly, affirm.

The relevant facts are few and undisputed. The evidence showed that defendant had cut and stolen copper wiring from a "slide fence" that ran along a Union Pacific Railroad "main-line track." Slide fences are used to detect track obstructions in areas where extreme hillsides or trees border the railroad right of way. When the wiring on a slide fence is cut or broken, the railroad company is alerted and train traffic is halted until the damage can be investigated and fixed.

Defendant was charged with criminal mischief in the first degree on the theory that he intentionally damaged railroad property "which was used in direct service to the public." At trial, defendant moved for a judgment of acquittal, arguing that there was no evidence that the slide fence was "used in direct service to the public." Alternatively, he argued that, regardless of how the slide fence was used, there was no evidence that the railroad track adjacent to the fence was used in service to the public rather than for Union Pacific's private purposes. The trial court denied the motion.

On appeal, defendant renews his argument that the railroad's slide fence was not "used in direct service to the public" within the meaning of ORS 164.365(1)(a)(E). Specifically, he contends that the slide fence *indirectly* supported

---

[1] That statute provides, in relevant part, that "[a] person commits the crime of criminal mischief in the first degree" by intentionally damaging or destroying "the property of a * * * railroad * * * used in direct service to the public[.]"

the railroad's service to the public by detecting possible blockages on the track but that the fence was not itself used to provide services to the public. Defendant argues further that, "to the extent defendant's conduct in damaging the slide fence impacted the tracks themselves," there was no evidence that the tracks were used in service to the public rather than for private enterprise. Although defendant acknowledges that a railroad employee described the track as a "main-line track," he contends that there was no evidence in the record as to what that designation means and that the record, therefore, was insufficient to support an inference that the tracks were used for a public function.

The state responds that the slide fence ensured the safe and efficient transport of persons or property aboard passing trains and that that function provided a direct benefit to the public. Thus, the state argues that the fence was "used in direct service to the public" within the meaning of ORS 164.365(1)(a)(E) and, consequently, that the trial court properly denied defendant's motion for judgment of acquittal.

In reviewing a trial court's denial of a motion for judgment of acquittal, "our task ordinarily is to determine whether, viewing the evidence in the light most favorable to the state, a rational trier of fact could have found the essential elements of the offense proved beyond a reasonable doubt." *State v. Thomas*, 229 Or App 453, 456, 211 P3d 979, *rev den*, 347 Or 349 (2009). However, where, as here, the dispute centers on the meaning of the statute defining the offense, the issue is one of statutory construction. *Id.* That is a question of law. *Id.*

When construing a statute, we examine the text of the statute in context, along with any relevant legislative history, to discern the legislature's intent. *State v. Gaines*, 346 Or 160, 171-72, 206 P3d 1042 (2009). ORS 164.365(1) provides, in relevant part:

"A person commits the crime of criminal mischief in the first degree who, with intent to damage property, and having no right to do so nor reasonable ground to believe that the person has such right:

"(a)   Damages or destroys property of another:

"* * * * *

"(E)   Which is the property of a public utility, telecommunications carrier, railroad, public transportation facility or medical facility used in direct service to the public; or

"(F)   By intentionally interfering with, obstructing or adulterating in any manner the service of a public utility, telecommunications carrier, railroad, public transportation facility or medical facility; or

"(b)   Intentionally uses, manipulates, arranges or rearranges the property of a public utility, telecommunications carrier, railroad, public transportation facility or medical facility used in direct service to the public so as to interfere with its efficiency."

As noted, defendant was convicted under ORS 164.365(1)(a)(E) for intentionally damaging or destroying "the property of a * * * railroad * * * used in direct service to the public." He does not dispute that, without any right to do so, he intentionally damaged or destroyed railroad property. Instead, defendant argues only that the railroad property he damaged was not "used in direct service to the public."

We start with the text of the statute, giving words of common usage their plain and ordinary meaning. *PGE v. Bureau of Labor and Industries*, 317 Or 606, 611, 859 P2d 1143 (1993). "Service" can encompass a broad range of meanings. As pertinent here, the term is variously defined as "the performance of work commanded or paid for by another," "an act done for the benefit or at the command of another," "conduct or performance that assists or benefits someone or something," "supply of needs," "useful labor that does not produce a tangible commodity * * * ‹railroads, telephone companies, and physicians perform ~s although they produce no goods›," and "the provision, organization, or apparatus for conducting a public utility or meeting a general demand ‹telephone ~› ‹air freight ~›." *Webster's Third New Int'l Dictionary* 2075 (unabridged ed 2002). Thus, generally speaking, the statute prohibits a person from damaging property used in the performance of work for the public or, put another way, property used in the provision of a benefit to the public.

The parties seem to agree that a railroad's primary service to the public is the transportation of passengers or goods. *See, e.g.*, ORS 824.020(2) (defining "railroad," in part, as a "common or for hire carrier"); ORS 164.125(2) (defining "services" for purposes of "theft of services" to include transportation; the supplying of public utilities such as gas, electricity, steam, and water; and the use of telephone, computer, and cable television systems). In the context of a railroad, then, the statute proscribes damaging property used in the provision of transportation to the public.

However, the statute contains a further limitation: the property must be used in "direct" service to the public. "Direct," like "service," has a multitude of meanings. Among the possible definitions are "operating or guided without digression or obstruction," "characterized by or giving evidence of a close esp. logical, causal, or consequential relationship," "marked by absence of an intervening agency, instrumentality, or influence : IMMEDIATE," and "made, carried on, or effected without any intruding factor or intervening step." *Webster's* at 640. Here, the statutory context does not favor any one definition. Nonetheless, collectively those definitions indicate that the damaged property must be closely related to or immediately used in the provision of transportation to the public.

Other provisions of the statute make similar references to the "service" of a railroad or other entity, or to property "used in direct service to the public," but provide little contextual guidance as to the meaning of those terms. *See* ORS 164.365(1)(a)(F) (prohibiting interference with the service of a public utility, railroad, or similar entity); ORS 164.365(1)(b) (prohibiting manipulation or rearrangement of property of a public utility, railroad, or similar entity "used in direct service to the public so as to interfere with its efficiency"). Nonetheless, our analysis of the statute's plain meaning is supported by the legislative history.

Prior to 1973, the offense of criminal mischief in the first degree was defined as damaging the property of another in an amount exceeding $1,000 or by means of an explosive. *See* ORS 164.365 (1971), *amended by* Or Laws 1973, ch 133, § 6 (defining criminal mischief in the first degree). In 1973,

the statute was amended to include damaging the property of a public utility or railroad "used in direct service to the public," without regard to the monetary amount of the damage. Or Laws 1973, ch 133, § 6.[2] The amendment was urged by various utility companies, which were concerned that the existing statutory scheme did not adequately deter persons whose conduct resulted in relatively little monetary damage to the company but caused unquantifiable collateral damage to the public. *See generally* Tape Recording, House Committee on Judiciary, HB 2677, Apr 17, 1973, Tape 18, Side 1 (public hearing on House Bill 2677).

Testimony of the bill's proponents suggests that the amendment was meant to protect property used as the means of delivering service as well as property that, if damaged, would cause a loss or interruption of service and potentially put the safety of the public at risk. *See* Tape Recording, House Committee on Judiciary, HB 2677, Apr 17, 1973, Tape 18, Side 1 (statement of Ben Swank, general security manager of Pacific Northwest Bell, explaining to legislators that the "intent of the bill is to protect the users of the [utilities] from those who would put their service out of commission"); Testimony, House Committee on Judiciary, HB 2677, Apr 17, 1973, Ex A (statement of Ben Swank that "[a]ny wilful damage or interference with public utility property used in direct service to the public can jeopardize public health and safety regardless of the damage amount * * *. This amendment would recognize the peril to the individual or the community when he or it is unable to call police, fire departments, or medical assistance, has no lights or whose drinking water may have been adulterated in some manner." (Underscoring in original.)); Testimony, House Committee on Judiciary, HB

---

[2] ORS 164.365 (1973/74), as enacted, provided, in relevant part:

"(1) A person commits the crime of criminal mischief in the first degree if, with intent to damage property, * * *

"* * * * *

"(c) He damages the property of a public utility or railroad used in direct service to the public, or wilfully uses, manipulates, arranges or rearranges public utility or railroad property used in direct service to the public so as to interfere with its efficiency, or wilfully interferes with, obstructs or adulterates in any manner the service of such public utility or railroad."

The statute has been amended a number of times since 1973, but those changes are not relevant to our determinations on appeal.

2677, Apr 17, 1973, Ex B (statement of Oliver Mansfield, security director of General Telephone Company of the Northwest, Inc., that "[we] endorse[ ] this amendment because of the effect of damage to the property of a public utility on the citizens of the state. Willful damage not only costs the utility money to rearrange or repair the service, but it causes tremendous inconvenience to the utility users with great potential danger to the public health and safety of the community."); Testimony, House Committee on Judiciary, HB 2677, Apr 17, 1973, Ex D (statement of Leonard Frank, Executive Director of the Utilities Security Association of Oregon, that "[o]ur members support this amendment because the existing criminal mischief section providing for penalties in the first, second and third degrees depend upon the monetary damage to the property involved in the mischief. While this may be reasonable in the ordinary case of private property, it is completely inadequate as regards *utility property*. The latter has a special character in that it *is the means of delivering* vital water, power and communication services to the public. Criminal mischief may entail little actual property damage at the site of mischief, but may cause wide-spread power outages, loss of communication or loss of control or adulteration of water supplies." (Emphases added.)).[3]

Furthermore, utility company representatives provided illustrations of the type of property damage that they understood to be covered by the amendment: a cut telephone cable that amounted to only $500 in actual damage but created a 17-hour outage affecting 174 customers, and a reversed switch on an electrical substation that entailed only minor physical damage but caused an hour-long power outage in a large service area. Testimony, House Committee on Judiciary, HB 2677, Apr 17, 1973, Ex B, D (statements of Oliver Mansfield and Leonard Frank, respectively).

---

[3] Luman Miller, representing the Oregon Railroad Association, also briefly testified and asked that railroads be included in the amendment. He stated that the amendment was needed to combat vandalism of railroad property, "which also represented a threat to safety" and was reasonably parallel to other utilities. Tape Recording, House Committee on Judiciary, HB 2677, Apr 17, 1973, Tape 18, Side 1 (statement of Luman Miller).

The testimony indicates widespread agreement among the bill's proponents as to its intended effect. Although that testimony does not specifically address the meaning of the phrase "used in direct service to the public," it nonetheless demonstrates the type of property damage likely contemplated to be within the scope of the statute: damage to property used as the means of delivering or providing service and damage to property that causes a loss or interruption of service.

As applied here, the plain meaning of the text and the legislative history suggest that the statute encompasses not only property that is the means of providing transportation, such as train cars or train tracks, but also property that is so closely related to the provision of transportation that its injury would cause a loss or disruption of service.[4] The railroad's slide fence performed a safety function connected to the provision of transportation and operated to halt service in the event of damage or destruction. Consequently, although the slide fence was not itself a means of providing transportation, it was so closely related to the provision of transportation that its destruction would (and did) cause a loss or disruption of service. Thus, the slide fence was "used in direct service" by the railroad.

Defendant nonetheless contends that, regardless of the function of the slide fence, there was no evidence in the record that the particular train track adjacent to the fence was used for the public rather than for Union Pacific's private corporate purposes. In other words, defendant contends that, even if the slide fence is used in the provision of transportation, there is no evidence that that service is for the "public."

The meaning of "public" in the statute is plain: members of the community as a whole. *See Webster's* at 1836 (defining "public" as "an organized body of people : COMMUNITY" or "the people as a whole"). It follows that a railroad's "service to the public" is the provision of transportation to members of the community. Here, although there

---

[4] We express no opinion as to whether ORS 164.365(1)(a)(E) includes other types of property functionally related to the service. Nor do we decide the scope of ORS 164.365(1)(a)(E) as applied to the property of other entities listed in the statute.

was little evidence about the use of the particular track in question, a railroad employee described it as a "main-line track." From that testimony, a trier of fact could infer that the railway was used in the provision of transportation—whether of passengers or goods—for members of the public. *See Webster's* at 1362 (defining "main line" as "a principal highway or railroad line"). Defendant offered no evidence to defeat that inference.

Accordingly, we conclude that the railroad's slide fence was "used in direct service to the public" within the meaning of ORS 164.365(1)(a)(E). The trial court did not err in denying defendant's motion for judgment of acquittal.

Affirmed.