Argued and submitted May 29, convictions on Counts 2 through 4 reversed;
otherwise affirmed October 29, 2014

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

PAULA CAMILLE JAMES,
*Defendant-Appellant.*

Marion County Circuit Court
12C48685; A153757

338 P3d 782

Lindsey J. Burrows, Deputy Public Defender, argued the cause for appellant. With her on the briefs was Peter Gartlan, Chief Defender, Office of Public Defense Services.

Peenesh H. Shah, Assistant Attorney General, argued the cause for respondent. With him on the brief were Ellen F. Rosenblum, Attorney General, and Anna M. Joyce, Solicitor General.

Before Duncan, Presiding Judge, and Wollheim, Judge, and Lagesen, Judge.

LAGESEN, J.

**LAGESEN, J.**

Defendant appeals from a judgment of conviction for three counts of furnishing alcohol to persons under 21 years of age, in violation of ORS 471.410(2), and one count of endangering the welfare of a minor, in violation of ORS 163.575. She assigns error to the trial court's denial of her motion for a judgment of acquittal on the furnishing counts, contending that the court's denial of the motion rested on an erroneous interpretation of ORS 471.410(2), and the evidence at trial was insufficient to support her convictions under a correct interpretation of the statute. We reverse in part.

## I. BACKGROUND

Defendant was charged by amended information with three counts of furnishing alcohol to persons under 21 years of age, ORS 471.410(2), and one count of endangering the welfare of a minor, ORS 163.575. With respect to the furnishing counts, the information alleged that defendant "did unlawfully make available alcoholic liquor" to three different minors: H, LC, and R. The state's theory at trial was that the alcohol that defendant "did unlawfully make available" was vodka that those three minors consumed after finding it in the kitchen of the house where defendant was a tenant. The evidence at trial, viewed in the light most favorable to the state, revealed the following.

Defendant, who was 37 years old at the time of trial, rented a room in the home of Tilahun, who was 25. Defendant moved into Tilahun's house sometime between November 14 and November 16, 2012. Within a few days after defendant moved in, Tilahun hosted a party for a local musical group. Tilahun created an event on her Facebook page and sent private invitations to approximately 15 to 20 prospective guests. The guests at the party included high school students, ranging in age from 14 to 17.

The first named victim, H, 15, was not familiar with defendant; she learned about the party from a friend. H arrived at the house at around 8:00 p.m. H estimated that there were approximately 10 people at the residence when she arrived. H did not see any alcohol at the residence

for the first hour that she was there. However, at around 9:00 p.m., a crowd of approximately 20 people arrived. H testified that, at that point in time, alcohol became available and people began drinking. Guests, including H, began drinking from a bottle of vodka sitting on the kitchen counter. H consumed approximately four shots of vodka over the course of the evening.

The second named victim, LC, 17, knew neither Tilahun nor defendant and did not receive a personal invitation to the party; she "heard about it" from other people. LC arrived at the party around 9:00 p.m., with a "big group" of people. When she arrived, there were a few people inside and a few people outside; she estimated that there were approximately six to eight people total at the house at that time. LC testified that, at the time she arrived, the people in the house were doing "[n]othing yet"; but she also testified later that people in the house were "[d]rinking, smoking." According to LC, "[a] lot of people ha[d] their own" alcohol, but she did not bring her own alcohol to the party. Instead, LC poured and consumed "a few shots" of vodka from a bottle that she found in the kitchen.

The third named victim, R, 15, was similarly unfamiliar with Tilahun and defendant; she, too, learned about the party "probably through friends." When R arrived at the party—she could not recall precisely when—she and friends sat around talking for awhile, and did not start drinking until an hour or two later. R drank Jagermeister from a bottle belonging to a friend and vodka from the "bottle * * * sitting somewhere in the kitchen."

Other guests described the party in a similar manner. S, 17, for example, was "acquainted with" Tilahun, but did not know her personally. When S arrived at the residence, there were "[a] lot [of] people" in the kitchen, as well as alcohol. A friend brought S some vodka; S also observed four or five "shots that were full, but * * * didn't see any actual bottles."

LL, 14,[1] knew Tilahun personally but learned about the party from a friend. LL estimated that he arrived at the

[1] LL was 15 at the time of trial.

party at "8:00 or 9:00." By the time that he arrived, there were five or six people outside the house and about 20 people inside the house. LL met defendant for the first time at the front door, where she was smoking a cigarette. LL and defendant introduced themselves, and the two shook hands. Defendant did not give LL alcohol; however, LL saw alcohol in the house. LL and his companions "took shots" from the alcohol "scattered all around the house." LL testified that there were shot glasses "in * * * the corner of the living room" and "bottles being passed around everywhere." LL drank "some of the vodka" from the bottle being passed around.

At 10:02 p.m., Deputy Landers was dispatched to the residence to investigate a report of a liquor violation. He arrived at approximately 10:11 p.m., and was joined by Deputy Bernards and Deputy Derschon. Landers observed that none of the guests outside the home appeared to be of legal drinking age; "[t]hey all looked like they were probably high school aged kids."

Defendant met Landers at the front door. Landers "asked [defendant] if there were any people under 21 years old there based on the report [the sheriff had] received of the[re] being underage drinking and marijuana use at the location." Defendant responded that, "no, there wasn't anyone under 21 there."

Over the course of the conversation, defendant was "very upset, argumentative, [and] generally just uncooperative" toward the deputies. Based on defendant's "kind of uncontrolled demeanor[] [and] her unwarranted hostility," Landers believed that defendant was intoxicated. Derschon shared that impression, noting that defendant's face was "[f]lushed," she was "slurring her words, [and] you could smell alcohol coming from her breath." At one point, defendant got "very close" to Derschon, and Derschon "had to put his hand on [defendant's] shoulder and push her back away from him." At that point, defendant slammed the door and retreated into the residence.

Eventually, defendant returned to the door. A moment later, Tilahun came to the door as well. Tilahun was "very intoxicated" and "slurring her speech." Landers asked Tilahun for permission to "do a walk-through [of]

the residence, [to] make sure there[] [was] nobody in there that[] [was] extremely intoxicated that[] [was] essentially a danger to themselves." Tilahun consented to the walk-through. Defendant went back into her bedroom and closed the door. She subsequently snuck out of the house.

Upon entering the house, Bernards observed that it "was just full * * * of kids." Bernards could tell that many of the guests were underage "by sight," noting that they appeared younger than his 18-year-old niece. Landers asked the guests in the living room if any of them were over age 21. Only three people raised their hands, and the deputies separated those three guests from the rest of the group. The deputies then contacted the parents of each underage attendee. They also called an ambulance to provide treatment for a male attendee who had passed out and had begun to vomit.

In the kitchen, Derschon observed what "appeared to be hard alcohol bottles," approximately four to six of them, and he "smelled [the] distinct smell of burnt marijuana." Bernards saw approximately three or four bottles of alcohol in the kitchen, as well as 5 to 10 beer cans on the floor in the living room and bathroom.

The next day, Landers returned to the house to make "follow-up contact" with defendant. Defendant told him that "she did not know there was going to be a party," and that, "when she saw all the underage people getting there, * * * she just didn't know what to do." Landers asked defendant why she had lied to him the night before, but defendant "didn't really give [him] a direct answer," instead "going back and saying she didn't know anybody was underage."

As noted, the party led to charges against defendant. At the close of the state's case, defendant moved for a judgment of acquittal on all counts. With respect to the furnishing counts, defendant argued that there was insufficient evidence connecting defendant to the vodka that the three minors consumed to permit the jury to find that defendant had made that alcohol available to H, LC, and R. The trial court denied the motion, and the jury convicted defendant on all charges. Defendant timely appealed. On appeal, she challenges only her convictions on the furnishing counts;

she does not contest her conviction for endangering the welfare of a minor.

## II. STANDARD OF REVIEW

We generally review the denial of a motion for a judgment of acquittal "by examining the evidence in the light most favorable to the state to determine whether a rational trier of fact, accepting reasonable inferences and reasonable credibility choices, could have found the essential element of the crime beyond a reasonable doubt." *State v. Cunningham*, 320 Or 47, 63, 880 P2d 431 (1994), *cert den*, 514 US 1005 (1995). "The issue is not whether we believe defendant is guilty beyond a reasonable doubt, but whether there was sufficient evidence for a jury to so find." *State v. Hall*, 327 Or 568, 570, 966 P2d 208 (1998). In analyzing the sufficiency of the evidence, "we make no distinction between direct and circumstantial evidence as to the degree of proof required." *Id.*

To the extent, however, that "the dispute [on review of a motion for a judgment of acquittal] centers on the meaning of the statute defining the offense, the issue is one of statutory construction." *State v. Wray*, 243 Or App 503, 506, 259 P3d 972 (2011). Statutory construction presents a question of law, *id.*, which we review for legal error, *Providence Health System v. Walker*, 252 Or App 489, 494, 289 P3d 256 (2012), *rev den*, 353 Or 867 (2013).

## III. ANALYSIS

The dispute on appeal centers on the meaning of ORS 471.410(2),[2] which provides, in relevant part, "No one *** may sell, give or *otherwise make available*" alcohol to minors. (Emphasis added.) In particular, because defendant

---

[2] ORS 471.410(2) provides, in full:

"No one other than the person's parent or guardian may sell, give or otherwise make available any alcoholic liquor to a person under the age of 21 years. A parent or guardian may give or otherwise make alcoholic liquor available to a person under the age of 21 years only if the person is in a private residence and is accompanied by the parent or guardian. A person violates this subsection who sells, gives or otherwise makes available alcoholic liquor to a person with the knowledge that the person to whom the liquor is made available will violate this subsection."

Although ORS 471.410 was amended and internally renumbered in part in 2014, those changes have no bearing on this appeal. Accordingly, all references to ORS 471.410 are to the present version of that statute.

was convicted of "otherwise mak[ing] available" alcohol to minors, the question for us is what did the legislature mean by the words "otherwise make available"? That is, what type of conduct did the legislature intend to encompass when it included that phrase in ORS 471.410(2)?

In defendant's view, "otherwise mak[ing] available" means "affirmatively provid[ing]" alcohol to minors by, for example, purchasing, serving, or pouring alcohol, or leaving it out for consumption by guests. Defendant further asserts that, if the statute is construed in that manner, the evidence is insufficient to support her convictions. The state interprets the phrase differently, arguing that "otherwise mak[ing] available" means that a defendant's acts or omissions were the "but for" cause of, or a "substantial factor" in, a minor's acquisition of alcohol. It contends that, under its construction of the statute, the evidence is sufficient to support defendant's convictions for furnishing alcohol to minors.

Ultimately, for the reasons explained below, neither party's proposed interpretation fully squares with the legislature's intent. Instead, we conclude that a person "otherwise make[s] available" alcohol to minors if that person authorizes minors' access to a supply of alcohol over which the person exercises control. We further conclude that the evidence in this case was not sufficient to permit a jury to find beyond a reasonable doubt that defendant controlled the alcohol supply on which the furnishing charges were predicated, and that, therefore, those convictions must be reversed.

A. *The meaning of "otherwise make available" in ORS 471.410(2)*

Our goal in construing ORS 471.410(2) is "to determine the meaning of the statute that the legislature that enacted it most likely intended." *Chase and Chase*, 354 Or 776, 780, 323 P3d 266 (2014) (citing *PGE v. Bureau of Labor and Industries*, 317 Or 606, 610, 859 P2d 1143 (1993)). To accomplish that goal, we "examine its text, its context, and, where appropriate, legislative history and relevant canons of construction." *Id.* (citing *State v. Gaines*, 346 Or 160, 171-73, 206 P3d 1042 (2009)).

The legislature added the phrase "otherwise make available" to ORS 471.410(2) in 1963, but did not define that

phrase; previously, the statute prohibited only the specific acts of selling and giving of alcohol. Or Laws 1963, ch 243, § 1. Under such circumstances, absent a legislative indication to the contrary, we look to the plain, ordinary meanings of the terms at issue, examining sources existing at the time of enactment to identify those meanings. *Comcast Corp. v. Dept. of Rev.*, 356 Or 282, 295-96, 296 n 7, 337 P3d 768 (2014) (observing that, notwithstanding the frequency with which the Supreme Court cites *Webster's Third New Int'l Dictionary* (unabridged ed 2002) to determine the plain meaning of statutory terms, "[i]n consulting dictionaries, however, it is important to use sources contemporaneous with the enactment of the statute"); *see Kohring v. Ballard*, 355 Or 297, 303-06, 325 P3d 717 (2014) (explaining approach for ascertaining plain meaning of statutory term).

As an initial matter, the plain meaning of the phrase "make available" suggests that the legislature broadly intended to prohibit conduct that results in minors possessing alcohol. "Make" in this context means "to cause to be or become : put in a certain state or condition." *Webster's Third New Int'l Dictionary* 1363 (unabridged ed 2002).[3] "Available" means "such as may be availed of : capable of use for the accomplishment of a purpose : immediately utilizable"; and "that is accessible or may be obtained : personally

---

[3] Notwithstanding its 2002 copyright date, we note that *Webster's Third New Int'l Dictionary* (unabridged ed 2002) can be considered to be a "contemporaneous" source for statutes dating back to 1961 (if not earlier). That is because that dictionary was published originally in 1961. Although it has been republished since that time in 1966, 1971, 1976, 1981, 1986, 1993, and 2002, it has not changed, except for minor corrections. Rather, any substantive updates are included in the addenda section at the front of the dictionary. As the publisher explains on its website:

"Since they were first released, *Webster's International Dictionary* and *Webster's Collegiate Dictionary* have been updated and revised many times. New editions of the unabridged appeared in 1909 (*Webster's New International Dictionary*), 1934 (*Webster's New International Dictionary, Second Edition*), and 1961 (*Webster's Third New International Dictionary, Unabridged*). Addenda sections, featuring words that came into use after publication of the 1961 edition, have been added regularly, most recently in 2002."

http://www.merriam-webster.com/info/commitment.htm (last visited Oct 24, 2014).

Because the content of *Webster's*—excluding the addenda section—has remained static since 1961, in general, it is appropriate to treat it as a contemporaneous source for statutes dating from at least that point forward, taking into account the updates to word usage reflected in the addenda section when the circumstances so require.

obtainable *** : at disposal." *Id.* at 150. Those definitions suggest, as noted, that the legislature intended to broadly prohibit conduct that results in minors having access to alcohol. Moreover, a broad prohibition would be consistent with the legislative purpose of the Liquor Control Act generally and the legislative purpose of ORS 471.410(2) in particular. In *Wiener v. Gamma Phi, ATO Frat.*, 258 Or 632, 638, 642, 485 P2d 18 (1971), the Supreme Court explained that ORS 471.410(2) is "intended to protect minors from *the evils of alcohol*" and "design[ed] *** to protect minors from *the vice of drinking alcoholic beverages.*" (Emphases added.) *See also* ORS 471.030(1)(c) (providing that the Liquor Control Act, of which ORS 471.410 is a part, "shall be liberally construed so as *** [t]o protect the safety, welfare, health, peace and morals of the people of this state").

However, notwithstanding those textual and contextual indications of the potential breadth of the prohibition contained in ORS 471.410(2), other context of the phrase "make available" indicates that the legislature intended to limit the scope of the prohibition. Significantly, the phrase "make available" does not stand by itself in the statute. Rather, it is preceded by the word "otherwise," and the entire phrase—"otherwise make available"—is a final, nonspecific phrase in a series. Under those circumstances, to properly understand what the legislature meant by its use of that phrase, we must also examine what it means to "sell" or to "give" alcohol. As the Supreme Court has counseled, "'[o]therwise' is a comparative word; that is, to construe properly the meaning of the word that 'otherwise' is modifying, we must examine the concept or word to which that modified word is being compared." *State v. Snyder*, 337 Or 410, 424, 97 P3d 1181 (2004). Under the principle of *ejusdem generis*, we "[o]rdinarily *** assume that a nonspecific term in a series[] *** shares the same qualities as the specific terms that precede it." *See ZRZ Realty v. Beneficial Fire and Casualty Ins.*, 349 Or 117, 140-41, 241 P3d 710 (2010), *adh'd to as modified on recons*, 349 Or 657, 249 P3d 111 (2011).[4]

---

[4] The principle of *ejusdem generis* is a rule of statutory construction that we employ to analyze the text and context of a statute. *See Gaston v. Parsons*, 318 Or 247, 253, 864 P2d 1319 (1994) (in interpreting the text of a provision, Supreme Court considers "rules of construction that bear directly on the interpretation of the statutory provision in context," including the maxim *ejusdem generis* (quoting

Here, to "sell" and to "give" are similar in that (1) both actions involve the transfer of ownership or possession from the seller or giver to the recipient; and, therefore, (2) both actions necessarily require that the seller or giver have some level of control over the item to be sold or given. Put another way, both are ways of *supplying* something to a recipient—conduct which, again, requires control over the thing supplied. "Sell," is defined, as relevant, as "to give up (*property*) to another for money or other valuable consideration." *Webster's* at 2061 (emphasis added); *see id.* at 1818 ("property," in turn, is defined as "something that is or may be owned or possessed"; "the exclusive right to possess, enjoy, and dispose of a thing"; and "something to which a person has a legal title"). "Give," is defined, as relevant, "to put into the *possession* of another for his use." *Id.* at 959 (emphasis added); *see id.* at 1770 ("possession," in turn, is defined as "the act or condition of having in or taking into one's control or holding at one's disposal" and "actual physical control or occupancy of property").[5]

---

*PGE*, 317 Or at 611)); *State v. Essex*, 215 Or App 527, 530, 170 P3d 1094 (2007) ("In construing the text of a statute in context, one of the relevant maxims is *'ejusdem generis*[]' ***.").

[5] Neither "sell" nor "give" is defined in the modern statute. *See* ORS 471.001. However, the foregoing dictionary definition of "sell" is consistent with the legislature's definition of that term in the 1951 version of the statute. Specifically, the 1951 version of the statute defined "to sell" as including

"[t]o solicit or receive an order for; to keep or expose for sale; to deliver for value or in any way other than purely gratuitously; to peddle; to keep with intent to sell; to traffic in; for any consideration, promised or obtained, directly or indirectly, or under any pretext or by any means whatsoever, to procure or allow to be procured for any other person ***."

Or Laws 1951, ch 570, § 1 (codified at OCLA § 24-103); *see* Or Laws 1951, ch 570, § 2 (at that time, the predecessor statute to ORS 471.410, OCLA § 24-137(3), made it unlawful for "any person to sell alcoholic liquor to any person under the age of 21 years," or for "any person other than a parent, guardian, or other responsible relative, to give any alcoholic liquor to any person under the age of 21 years").

Similarly, the foregoing dictionary definition of "give" is consistent with the Supreme Court's interpretation of the term in another pre-1963 version of the statute. In *State v. Gordineer*, 229 Or 105, 109-10, 366 P2d 161 (1961), the court held that, where the statute provided that, "[n]o person other than a parent, guardian, or other responsible relative, shall give any alcoholic liquor to any person under the age of 21 years," the "giv[ing]" of alcohol to a minor could be accomplished in one of two ways: (1) "by the giving of alcoholic liquor for immediate consumption by the minor such as a single or several drinks from the alcoholic liquor in the possession of another"; or (2) "by the giving of a quantity of liquor to the minor with intent that the possession of the liquor pass to the minor." (Internal quotation marks omitted.)

That context suggests that, by including the phrase "otherwise make available" in the list of prohibited acts in ORS 471.410(2), the legislature intended both to "broaden[]" the scope of the statute to reach an expanded range of conduct resulting in minors' access to alcohol, while at the same time "stay[ing] within th[e] familiar arena" of the specific acts of selling and giving. *Southern Pacific Trans. Co. v. Dept. of Rev.*, 295 Or 47, 62, 664 P2d 401 (1983) (so stating, where statute defined "property" as "real and personal, tangible and intangible, used or held * * * as owner, occupant, lessee, *or otherwise*" (internal quotation marks omitted; emphasis added)).[6] Because a distinguishing feature of both "sell[ing]" and "giv[ing]" is ownership or control on the part of the seller or giver, the principle of *ejusdem generis*, together with the ordinary meaning of the phrase "make available," suggest that a person "otherwise make[s] available" alcohol to minors within the meaning of ORS 471.410(2) when that person—through words or conduct—authorizes minors' access to a supply of alcohol over which the person exercises control.

That interpretation—that a person "otherwise make[s] available" alcohol to a minor by authorizing access to a supply of alcohol over which the defendant exercises control—is in line with our prior cases under ORS 471.410(2). Although we have neither addressed the precise question presented here, nor engaged in a methodical statutory construction analysis, we have implicitly interpreted the statute to prohibit conduct that amounts to the supplying of alcohol to minors, but not conduct that is, in effect, mere acquiescence in the consumption of alcohol by minors. For example, in *State v. Barraza*, 206 Or App 505, 507-10, 136 P3d 1126 (2006), we considered whether an officer had probable cause to believe that the crime of furnishing alcohol to a minor in violation of ORS 471.410(2) was being committed in a house, so as to permit a warrantless search of the house for evidence of that crime. Notwithstanding the facts that a minor had admitted to drinking in the

---

[6] *But see Fisher et al. v. City of Astoria*, 126 Or 268, 282, 269 P 853 (1928) (holding the rule of *ejusdem generis* inapplicable to interpret the nonspecific term "otherwise improve" where the legislature had expressly defined the word "improve").

house, and persons who appeared to be age 21 or older were present in the house, we concluded that the officer lacked probable cause to believe that ORS 471.410(2) had been violated by someone in the house because, on those facts, it was "mere speculation" that the minor had obtained the alcohol that he consumed from someone inside the house, rather than elsewhere. *Barraza*, 206 Or App at 510. By so concluding, we implicitly recognized that "otherwise mak[ing] available" alcohol to a minor within the meaning of ORS 471.410(2) requires something more than merely failing to stop or prevent a minor from consuming alcohol. If acquiescing in a minor's consumption of alcohol, standing alone, were sufficient to violate the statute, then the facts known to the officer in *Barraza* would have been sufficient to establish probable cause to believe that the crime of furnishing alcohol to a minor was being committed.[7] Reading ORS 471.410(2) to require that a defendant have control over the supply of alcohol accessed by a minor ensures that that "something more" is present while, at the same time, gives effect to the legislature's evident intent to prohibit a wide range of conduct that results in alcohol reaching the hands of minors.

In sum, we conclude, from the text and context[8] of ORS 471.410(2), that a person "otherwise make[s] available" alcohol to a minor when that person authorizes minors'

---

[7] Similarly, in *State v. Irving*, 74 Or App 600, 703 P2d 983 (1985), we implicitly recognized that the key issue under ORS 471.410(2) is whether the defendant was the source of any alcohol obtained by a minor victim when, upon recognizing that the trial court had misheard the minor victim's testimony regarding the source of the alcohol that he had consumed, we remanded to the trial court to reconsider its decision under a correct view of the evidence regarding the source of the alcohol.

[8] We limit our analysis to the text and context of ORS 471.410(2), because the available legislative history of the provision is sparse and not illuminating.

We note that defendant asserts that we should consider ORS 471.410(3) in our contextual analysis of ORS 471.410(2). However, that provision was enacted in 1995, over thirty years after the enactment of ORS 471.410(2). Or Laws 1995, ch 756, § 1. Consequently, it would bear on the contextual analysis of ORS 471.410(2) only if that provision necessarily evidenced an intent "by the legislature to modify or otherwise alter the meaning of the original terms of the statute." *State v. Swanson*, 351 Or 286, 290, 266 P3d 45 (2011); *see State v. Ofodrinwa*, 353 Or 507, 529-30, 300 P3d 154 (2013). We have reviewed ORS 471.410(3) and its legislative history, and we can discern no such intent.

access to an alcohol supply over which the person exercises control.[9]

B.  *Sufficiency of the evidence that defendant "otherwise ma[d]e available" alcohol to minors*

Applying that standard to the evidence adduced in this case, we conclude that the evidence is insufficient to establish defendant's guilt of furnishing alcohol to the three minor victims identified in the information. As mentioned, the state's theory of the case was that defendant had made available the vodka that those victims consumed at the house. Defendant's conduct conceivably authorized access to the vodka; by admitting minors to her residence, and by not stopping them from drinking, she implicitly authorized the activity to continue. However, on this record, it is entirely speculative whether defendant had control over that vodka or, instead, simply acquiesced in the minors' consumption of alcohol that had been obtained from someone else's supply.

There is no direct evidence that defendant supplied alcohol to anyone, apart from herself. And the circumstantial

---

[9] Although subsequently enacted provisions of the Liquor Control Act generally do not bear on our interpretation of ORS 471.410(2), as we have observed, 266 Or App at 671 n 8, we note that our focus on whether defendant had control over the alcohol supply is consistent with our interpretation of ORS 471.565(2)(a) in *Baker v. Croslin*, 264 Or App 196, 330 P3d 698 (2014). *See* Or Laws 1979, ch 801, §§ 1-2 (enacting predecessor statutes to ORS 471.565(2)(a)). That provision provides, pertinently, that a licensee, permittee, or social host is not liable for damages caused by an intoxicated patron or guest unless the licensee, permittee, or social host "served or provided" the patron or guest with alcohol while the patron or guest was visibly intoxicated. ORS 471.565(2)(a). In *Baker*, we held that the key factor in assessing whether a social host had "served or provided" the alcohol consumed by a visibly intoxicated guest was whether the host had control over the alcohol supply from which the guest obtained the alcohol. 264 Or App at 199-200.

Additionally, although extrajurisdictional interpretations of different state furnishing statutes do not control our construction of Oregon's statute, we note that our focus on a defendant's control over the alcohol supply is consistent with the approach taken by other state courts. *See Sagadin v. Ripper*, 175 Cal App 3d 1141, 1158, 221 Cal Rptr 675 (1985) ("In order to furnish an alcoholic beverage the offender need not pour the drink; it is sufficient if, *having control of the alcohol*, the defendant takes some affirmative step to supply it to the drinker." (Emphasis added.)); *State v. Souza*, 846 P2d 1313, 1319 (Utah Ct App 1993) (citing *Sagadin* with approval and concluding that "furnish or supply" requires that a defendant, among other things, "has some measure of *control* over the alcohol in question" (emphasis in original)); *Lather v. Berg*, 519 NE2d 755, 763 (Ind Ct App 1988) (absent evidence that a defendant had possession or control of alcohol obtained by minor, he or she could not be convicted of furnishing alcohol to minor).

evidence is insufficient to permit the finding that defendant exercised control over the vodka on which the charges were predicated. H testified without contradiction that there was a period of time at the beginning of the party where people were not drinking and that the drinking began later, around the time a large group of people arrived. R, too, testified without contradiction that there was a period of time where she was not drinking, but was sitting around talking. LC, who arrived just before the onslaught of the crowd, testified that people were doing "[n]othing yet." On those facts, it is just as likely that the vodka arrived with the crowd of guests who descended on the house as it is that the vodka derived from a supply that was under defendant's control at the house—particularly in the light of the evidence that "[a] lot" of the partygoers brought their own alcohol.

At trial, the state relied heavily on the testimony of LC to argue that the vodka had been present at the house at the outset of the party, and, thus, the jury reasonably could infer that defendant was the source of the vodka. If LC's testimony did, indeed, establish that the vodka had been present at the house from the start, then that evidence very well might permit the reasonable inference that defendant had control over the vodka. But we do not believe that LC's testimony can bear the weight that the state placed on it.

For one, LC's testimony indicated that she did not arrive at the start of the party; she testified that she arrived at 9:00 p.m. with a group, shortly before the crowd proliferated. That testimony is consistent with, and does not call into question, H's testimony that alcohol was not available at the party for the first hour that she was there, and did not become available until around 9:00 p.m., when a large group of people arrived. In addition, although LC did testify that people inside the house were "[d]rinking, smoking," her testimony did not specify *when* those people were drinking and smoking. Moreover, her testimony affirmatively indicated that people were not drinking and smoking when she first arrived. Again, she testified that when she "first arrived" there were only three or four people in the house (as well as three or four people outside of the house), and that when she "first came," those people were doing "[n]othing yet." That testimony, considered as a whole, does not permit the

reasonable inference that the vodka that LC and the other victims ultimately consumed came from a supply of alcohol that originated from defendant's house. If anything, it tends to suggest to the contrary—that the alcohol arrived with the surge of people that arrived around 9:00 p.m.

Nor does any other evidence in the record permit a rational inference that the alcohol that the three minor victims consumed came from a supply controlled by defendant. Although there was evidence that defendant was present and drinking that night—which, together with the fact that alcohol was being consumed in her house, might permit the inference that defendant had control over *some* type of alcohol that night—that evidence does not make it more likely than not (let alone permit an inference beyond a reasonable doubt) that any supply of alcohol that defendant controlled was the source of the vodka that the minors identified in the charges consumed.

In sum, the evidence presented at trial was insufficient to demonstrate that defendant "otherwise ma[d]e available" alcohol to H, LC, and R, because the evidence is insufficient to permit the finding that defendant controlled the supply of alcohol that those three minor victims accessed at defendant's house.[10]

## IV. CONCLUSION

For the foregoing reasons, the judgment is reversed as to defendant's convictions and sentences on Counts 2

---

[10] As noted, 266 Or App at 671 n 8, a different provision of the Liquor Control Act prohibits a person from permitting a minor (other than the person's child or ward) to consume alcohol on real property controlled by the person, or to remain on the person's real property if the minor is consuming alcohol. ORS 471.410(3)(a) provides:

"A person who exercises control over private real property *may not knowingly allow* any other person under the age of 21 years who is not a child or minor ward of the person to consume alcoholic liquor on the property, or allow any other person under the age of 21 years who is not a child or minor ward of the person to remain on the property if the person under the age of 21 years consumes alcoholic liquor on the property."

(Emphasis added.) A first violation of ORS 471.410(3) is a Class A violation, and a second or subsequent violation is a specific fine violation, rather than a crime. ORS 471.410(10)(a)-(b). Whether defendant's conduct violated ORS 471.410(3) is not at issue in this appeal.

through 4 for furnishing alcohol to minors. Defendant's conviction on Count 1 is affirmed.

Convictions on Counts 2 through 4 reversed; otherwise affirmed.