Argued and submitted June 14, 2023, affirmed August 23, 2023

TRUNORTH WARRANTY PLANS
OF NORTH AMERICA, LLC,
a North Carolina limited liability company,
*Petitioner,*

*v.*

DEPARTMENT OF CONSUMER
AND BUSINESS SERVICES,
*Respondent.*

Department of Consumer and Business Services
INS200003; A177597

536 P3d 24

Petitioner, an out-of-state company that sells warranty agreements for commercial vehicles, seeks judicial review of a final order of the Department of Consumer and Business Services (DCBS) imposing a $14,000 civil penalty and ordering petitioner to cease and desist from violating various provisions of the Oregon Service Contract Act (OSCA), ORS 646A.150 to ORS 646A.172. On review, petitioner contends that DCBS erred when it concluded that the OSCA applies to contracts involving commercial transactions between businesses. Petitioner further argues that DCBS erred when it denied petitioner's request to depose witnesses. *Held*: After reviewing the text, context, and legislative history, the Court of Appeals concluded that the OSCA regulates transactions between businesses involving commercial products. The court further determined that DCBS did not abuse its discretion when it denied petitioner's request to depose witnesses.

Affirmed.

Bradford H. Lamb argued the cause for petitioner. Also on the opening brief were R. Daniel Lindahl, Laura Caldera Loera, and Bullivant Houser Bailey PC. Also on the reply brief were Laura Caldera Loera and Bullivant Houser Bailey PC.

Leigh A. Salmon, Assistant Attorney General, argued the cause for respondent. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before Aoyagi, Presiding Judge, and Joyce, Judge, and Jacquot, Judge.

JOYCE, J.

Affirmed.

**JOYCE, J.**

The Oregon Service Contract Act (OSCA), ORS 646A.150 to 646A.172, "[c]reate[s] a legal framework within which service contracts may be sold in this state[.]" ORS 646A.150(1)(a). The question that we must answer in this judicial review proceeding is whether the legislature intended to exclude from that framework contracts that involve commercial transactions between businesses. Petitioner, an out-of-state company that sells warranty agreements for commercial vehicles, seeks judicial review of a final order of the Department of Consumer and Business Services (DCBS) imposing a $14,000 civil penalty and ordering petitioner to cease and desist from violating various provisions of the OSCA. On review, petitioner contends that DCBS erred when it concluded that the OSCA applies to contracts involving commercial transactions between businesses. Petitioner further argues that DCBS erred when it denied petitioner's request to depose witnesses. We affirm.

## FACTUAL BACKGROUND

Petitioner is a North Carolina company that sells warranty agreements covering the repair or replacement of certain component parts of commercial motor vehicles. Between 2016 and 2019 petitioner sold warranty agreements to individuals or entities with Oregon addresses. In 2017, a trucking company headquartered in Oregon purchased one of petitioner's warranty agreements through a dealer in Oregon. DCBS concluded that petitioner violated the OSCA by failing to follow the requirements for service contracts. *See* ORS 646A.154 - 646A.158 (setting out requirements). It issued a proposed order to cease and desist and imposed civil penalties. Petitioner then requested a contested case hearing.

Before the contested case hearing, petitioner sought permission to take depositions of five individuals whose testimony it asserted would be material to its case. DCBS denied that request, because the individuals would be available to testify at the hearing. Petitioner then moved for summary determination based on its theory that the OSCA applies only to property purchased for personal, family, or

household use and not to the kinds of commercial transactions that petitioner engages in.

The administrative law judge (ALJ) denied the motion, concluding that the OSCA applies to both personal and commercial transactions. The case then proceeded to a contested hearing based on stipulated facts. The ALJ determined that petitioner had failed to comply with the requirements of the OSCA and recommended a $14,000 civil penalty and the issuance of a cease-and-desist order. DCBS adopted the proposed order in its entirety, and petitioner timely sought judicial review.

## DISCUSSION

In its first claim of error, petitioner continues to assert that the OSCA does not apply to contracts involving commercial products and is instead limited to contracts that involve property that is purchased for personal, family, or household purposes.[1] The parties' dispute centers around the definition of "service contract," which is defined as "a contract or agreement to perform or indemnify for a specific duration the repair, replacement or maintenance of property" and that requires "obligors" who sell such service contracts to comply with the OSCA. ORS 646A.154(1)(a).

"Determining the intended meaning of a statute is a question of law." *DCBS v. Muliro*, 359 Or 736, 742, 380 P3d 270 (2016). The parties do not dispute, and we agree, that the relevant terms at issue are not delegative, and therefore the agency's interpretation is owed no deference. *See Springfield Education Assn. v. School Dist.*, 290 Or 217, 223, 621 P2d 547 (1980) (summarizing the categorization of statutory terms in agency cases). We thus turn to the relevant statutory text to determine whether the OSCA applies to commercial transactions of the kind that petitioner here engages in.

To answer that question, "[w]e ascertain the legislature's intentions by examining the text of the statute in its context, along with relevant legislative history, and, if necessary, canons of construction." *State v. Cloutier*, 351 Or

---

[1] We understand petitioner's use of that phrase to refer generally to noncommercial transactions; that phrasing does not appear in the OSCA.

68, 75, 261 P3d 1234 (2011) (citing *State v. Gaines*, 346 Or 160, 171-73, 206 P3d 1042 (2009)). When the legislature provides a definition of a statutory term, we use that definition. *Comcast Corp. v. Dept. of Rev.*, 356 Or 282, 295, 337 P3d 768 (2014). As noted, the OSCA defines a "service contract" as "a contract or agreement to perform or indemnify for a specific duration the repair, replacement or maintenance of property for operational or structural failure that results from a defect in materials, workmanship or normal wear and tear[.]" ORS 646A.154(1)(a). The text contains no express limitation on the types of parties or "property" that are to be regulated within "service contracts."

Instead, the definition focuses on agreements that involve the "repair, replacement or maintenance of property." ORS 646A.154(1)(a). "[P]roperty" is not defined. "In the absence of any evidence to the contrary, we assume that the legislature intended to give those words their plain, natural, and ordinary meaning, relying on dictionaries that were in use at the time the statute was enacted." *State v. Delaurent*, 320 Or App 191, 195, 514 P3d 113, *rev den*, 370 Or 303 (2022) (citations and internal quotation marks omitted). "Property" is defined in relevant part as "something that is or may be owned or possessed." *Webster's Third New Int'l Dictionary* 1818 (unabridged ed 2002).[2] Nothing about that definition indicates that the term "property" in the OSCA would be limited, as petitioner contends, to property that is owned or possessed for personal, family, or household purposes. And, axiomatically, we cannot insert words into a statute that the legislature did not include. *See* ORS 174.010 ("In the construction of a statute, the office of the judge is simply to ascertain and declare what is, in terms or in substance, contained therein, not to insert what has been omitted, or to omit what has been inserted[.]").

Other definitions in the OSCA similarly are not limited to service contracts for personal, family, or household goods. A "service contract holder" is "a person that purchases or holds a service contract." ORS 646A.152(5). An "obligor"

---

[2] We have previously stated, "[n]otwithstanding its 2002 copyright date, * * * *Webster's Third New Int'l Dictionary* (unabridged ed 2002) can be considered to be a 'contemporaneous' source for statutes dating back to 1961 (if not earlier)." *State v. James*, 266 Or App 660, 667 n 3, 338 P3d 782 (2014).

is a "person that is contractually obligated to the service contract holder to provide service under a service contract." ORS 646A.152(2)(a). "Person" in turn is defined as "an individual, partnership, corporation, incorporated or unincorporated association, joint stock company, reciprocal, syndicate or any similar entity or combination of entities acting in concert." ORS 646A.152(3). Under those definitions, a "person" includes both individuals and business entities, both as the party purchasing a service contract and the party providing the service contract (the obligor).

However, petitioner argues that notwithstanding those definitions, the OSCA's broader context demonstrates that "service contract" does not refer to commercial transactions. More specifically, petitioner argues that, because the OSCA uses the word "consumer" at various points, it does not apply to commercial transactions, because "consumer" means an individual involved in a transaction "primarily for personal, family or household purposes." The question thus becomes whether the legislature's use of the term "consumer" in other parts of the OSCA indicates a legislative intent to define "service contract" more narrowly than the plain meaning of the text would otherwise suggest.

The OSCA uses the word "consumer" three times:

- ORS 646A.150(1)(b) provides that the OSCA "[e]ncourage[s] innovation in the marketing and development of more economical and effective means of providing services under service contracts, while placing the risk of innovation on the obligors rather than on consumers";

- ORS 646A.154(1)(c) instructs that "[c]onsideration for a service contract must be stated separately from the price of the consumer product"; and

- ORS 646A.154(10) provides that "[i]f a service contract seller is not the same person as the obligor under the service contract, the service contract seller shall remit the agreed-upon consumer purchase price of the service contract to the obligor within 30 days after selling the service contract[.]"

The OSCA does not define the terms "consumer," "consumer product," or "consumer purchase price."

The parties disagree as to the meaning of the word "consumer." In petitioner's view, "consumer" necessarily excludes commercial entities selling commercial products. We disagree. The ordinary meaning of "consumer" is defined in relevant part as "one that utilizes economic goods." *Webster's* at 490. As both an individual and commercial entity are capable of utilizing economic goods, that definition would include both individual and commercial consumers. Yet another dictionary provides both a broader and narrower definition. At the time the OSCA was enacted, the common legal definition of "consumer" was quite lengthy[3] and included definitions such as "[u]sers of the final product" and "[a] buyer (other than for purposes of resale) of any consumer product[.]" *Black's Law Dictionary* 316 (6th ed 1990).[4] The *Black's Law Dictionary* further defined "consumer product" as "[a]ny tangible personal property which is distributed in commerce and which is normally used for personal, family, or household purposes[.]" *Id.* at 317. Thus, *Black's* contained both a broader definition of consumer that would encompass commercial transactions, as well as a narrower definition that would not. Importantly, however, nothing about either the ordinary lay or common legal meaning

---

[3] The entire definition of "consumer" provided:

"One who consumes. Individuals who purchase, use, maintain, and dispose of products and services. Users of the final product. A member of that broad class of people who are affected by pricing policies, financing practices, quality of goods and services, credit reporting, debt collection, and other trade practices for which state and federal consumer protection laws are enacted. Consumers are to be distinguished from manufacturers (who produce goods), and wholesalers or retailers (who sell goods). *See also* Purchaser.

"A buyer (other than for purposes of resale) of any consumer product, any person to whom such product is transferred during the duration of an implied or written warranty (or service contract) applicable to the product, and any other person who is entitled by the terms of such warranty (or service contract) or under applicable State law to enforce against the warrantor (or service contractor) the obligations of the warranty (or service contract)."

*Black's Law Dictionary* 316 (6th ed 1990).

[4] Petitioner points to the definition of "consumer" contained in the 2019 edition of *Black's Law Dictionary* as further support for its argument. However, "[w]e consult dictionaries in use at the time of the legislature's enactment" when we interpret the words of a statute. *State v. Clemente-Perez*, 357 Or 745, 763, 359 P3d 232 (2015).

of the term "consumer" contradicts the plain text, which, as we have explained, indicates that commercial transactions between businesses are covered by the OSCA.

Petitioner notes that other sections of chapter ORS 646A define the term "consumer" in ways that limit it to transactions primarily "for personal, family or household purposes." *See, e.g.*, ORS 646A.120(3) (so defining "consumer" in the context of lease-purchase agreements); ORS 646A.293(3) (so defining "consumer" in the context of automatic renewal and continuous service offers); ORS 646A.400(2) (so defining "consumer" in the context of enforcement of express warranties on new motor vehicles). However, all of those definitions are explicit that they apply only to their respective sections within chapter 646A.[5]

In fact, other sections of chapter ORS 646A use the term "consumer" in ways that are clearly *not* limited to individual consumers purchasing products for personal, family or household purposes. *See, e.g.*, ORS 646A.430(1) (defining "consumer" as "a person in this state who purchases a vehicle protection product or who possesses a vehicle protection product and is entitled to enforce a warranty for the product by reason of the person's possession"); ORS 646A.460(5)(a) (defining "consumer" to include the "purchaser of an assistive device, if the device was purchased from a dealer or manufacturer for purposes other than resale"); ORS 646A.300(8)(c) (defining "farm implements" as "[o]ther consumer products used for agricultural purposes *** that a supplier supplies to a retailer under a retailer agreement"). While we acknowledge that chapter ORS 646A often uses the term "consumer" in the context of individual consumers purchasing products for personal, family, or household purposes, it is not so universal as to compel that interpretation when the OSCA itself has not defined the term in that fashion.[6]

---

[5] Petitioner also points to caselaw interpreting the phrase "consumer product" under the Magnuson-Moss Warranty Act, 15 USC §§ 2301 - 2312, to support its assertion that the service contract statutes do not apply to commercial transactions. The cases interpreting the Magnuson-Moss Warranty Act are not persuasive, because that statute explicitly defines a "consumer product" as "any tangible personal property *** which is normally used for personal, family, or household purposes." 15 USC § 2301(1).

[6] Petitioner asserts that our caselaw interpreting the Uniform Trade Practices Act (UTPA) is relevant context to our interpretation of the OSCA, and

Indeed, one additional piece of contextual evidence strongly indicates that the OSCA is not limited to transactions between businesses and individual consumers. ORS 646A.154(1)(a)(F) provides that service contracts may cover incidental costs relating to the failure of a vehicle protection product and cross-references the definition of "vehicle protection product" contained in ORS 646A.430. That definition uses the term "consumer." ORS 646A.430(5)(a)(A)(ii). ORS 646A.430(1) defines "consumer" as "a person in this state who purchases a vehicle protection product or who possesses a vehicle protection product and is entitled to enforce a warranty for the product by reason of the person's possession," which is not limited to individual consumers purchasing noncommercial products.[7] If we were to determine that the OSCA did not cover commercial transactions, our interpretation would be in tension with the statute's adoption of the definition of "vehicle protection product" contained in ORS 646A.430. Thus, consistency between the two statutes counsels in favor of interpreting "consumer" in the OSCA to include commercial transactions. *See Village at Main Street Phase II v. Dept. of Rev.*, 356 Or 164, 175, 339 P3d 428 (2014) ("[T]he general assumption of consistency counsels us to assume that the legislature intended the same word to have the same meaning throughout related statutes unless something in the text or context of the statute suggests a contrary intention.").

Lastly, we turn to the legislative history. *See Gaines*, 346 Or at 172 (the court will consult legislative history after examining text and context). To be sure, the legislative history is clear that the OSCA was created with individual consumers in mind. Every example presented to the legislature

---

notes that the UTPA has been interpreted to be limited to consumers and to not apply to businesses. Those cases do not inform our analysis for two reasons. First, the UTPA defines "[r]eal estate, goods [and] services" to mean "those that are or may be obtained primarily for personal, family or household purposes," thereby explicitly limiting the reach of the statute (unlike the OSCA). ORS 646.605(6)(a). Second, the legislative history of the UTPA is clear that the bill sought to protect "consumers rather than businesses." *Denson v. Ron Tonkin Gran Turismo, Inc.*, 279 Or 85, 90 n 4, 566 P2d 1177 (1977) (internal quotation marks omitted).

[7] The vehicle protection product statutes do not define "person," but that term is used in the definitions of "consumer," "seller," and "warrantor," indicating that the term applies to both business and individual entities. ORS 646A.430(1), (4), (6)(a).

involved products that are usually marketed to individual consumers, and the protection of individual consumers was considered paramount as the bill made its way through the legislature.[8] However, there was no discussion as to whether the legislature intended to exclude commercial transactions between businesses from the same protections that the legislators were seeking to implement through the OSCA. Indeed, the parties involved in drafting the bill acknowledged that the bill broadly defined a service contract—though those discussions were focused on the types of damages covered by service contracts rather than the parties purchasing the service contract. *See* Tape Recording, House Committee on Commerce, Subcommittee on Business, HB 3278, May 4, 1995, Tape 79, Side A (comments of Bill Brooks, representative of the Insurance Division of DCBS) (expressing concerns about the broad definition of "service contract" and arguing that the language could potentially cover damage caused to a computer by vandalism); Tape Recording, House Committee on Commerce, Subcommittee on Business, HB 3278, May 4, 1995, Tape 79, Side A (comments of Julie Brandis representing Associated Oregon Industries) (communicating that the purpose of writing a broad definition of "service contract" was so as not to preclude certain services).

---

[8] *See*, *e.g.*, Tape Recording, House Committee on Commerce, Subcommittee on Business, HB 3278, Apr 20, 1995, Tape 59, Side A (statement of Julie Brandis, representing Associated Oregon Industries) (giving examples of service contracts involving a television, stereo, and Walkman); Exhibit A, House Committee on Commerce, Subcommittee on Business, HB 3278, Apr 20, 1995 (testimony of Julie Brandis) (giving examples of service contracts involving a television, stereo and Walkman); Tape Recording, House Committee on Commerce, Subcommittee on Business, HB 3278, Apr 25, 1995, Tape 64, Side A (comment of Bill Brooks, representative of the Insurance Division of DCBS) (illustrating his concern about breadth of service contract definition with example of computer in a home being damaged by lightning); Tape Recording, House Committee on Commerce, Subcommittee on Business, HB 3278, May 4, 1995, Tape 79, Side A (statement of Bill Brooks) (giving an example of a computer being damaged by vandalism); Exhibit H, House Committee on Commerce, Subcommittee on Business, HB 3278, May 4, 1995 (testimony of Assistant Attorney General Peter Shepherd) (supporting legislation "to improve the protection of consumers of extended service contract products"); Tape Recording, Senate Committee on Rules and Elections, HB 3278, June 1, 1995, Tape 88, Side A (statement of Julie Brandis) (communicating that the bill regulates and provides consumers with protection when purchasing first and third party extended service contracts); Tape Recording, Senate Committee on Rules and Elections, HB 3278, June 1, 1995, Tape 88, Side A (comments of Bill Brooks) (illustrating concerns using an example where Sears is selling computers).

Importantly, the definition of a service contract originally referenced "the repair, replacement or maintenance of a *specified consumer product*." Exhibit B, House Committee on Commerce, Subcommittee on Business, HB 3278, Apr 20, 1995 (proposed amendments to HB 3278 (emphasis added)). That language was removed from the bill, and the term "specified consumer product" was replaced with the word "property." *Former* ORS 646.267(1) (1995), *renumbered as* ORS 646A.154(1)(a) (2007). The legislative record does not explain why that change in language occurred, but, as explained above, the word "property" has a broad meaning that is not limited to consumer products.

Even when the legislature enacts a statute to deal with a particular problem, it may choose to use broader language to address the issue in a more comprehensive way. *See State v. Walker*, 356 Or 4, 21-22, 333 P3d 316 (2014) (recognizing that the legislature may choose language that effectuates a broader solution in an effort to more expansively address the specific problem spurring the legislation). Without a clear indication that the legislature intended to exclude commercial transactions, "we will not 'insert what has been omitted.'" *State v. Lee*, 371 Or 200, 218, 532 P3d 894 (2023) (quoting ORS 174.010). To read such a limitation based on the use of the word "consumer" in nondefinitional parts of the statute and the legislature's silence is beyond our purview. *See Walker*, 356 Or at 22-23 ("[O]ur role is not to draft or revise the laws, or to refine the policy reflected in the law."). Accordingly, we conclude that the OSCA regulates transactions between businesses involving commercial products.

Turning to petitioner's second assignment of error, we review the denial of petitioner's request to take depositions for abuse of discretion. *See* ORS 183.482(8)(b)(B) (this court will remand if the agency's exercise of discretion is "[i]nconsistent with an agency rule, an officially stated agency position, or a prior agency practice, if the inconsistency is not explained by the agency"). OAR 137-003-0572(1) is clear that "[d]epositions may not be taken in contested cases without agency authorization." Additionally, any petition for an order to take a deposition of a witness "shall * * *

explain why no other means of obtaining the witness's testimony for the hearing is adequate." OAR 137-003-0572(2). DCBS denied petitioner's request because the witnesses were all available to testify at the hearing. That was permissible under the agency's rules, and thus, there was no abuse of discretion.[9]

Affirmed.

_____

[9] Petitioner's citations to OAR 137-003-0567 and OAR 137-003-0568 are inapposite, because neither deals specifically with depositions.