No. 403 May 13, 2026 463

IN THE COURT OF APPEALS OF THE
STATE OF OREGON

Estate of Jacob Latif Mesch,
by and through its Personal Representative
Leila Hotaki MESCH,
*Plaintiff-Appellant,*

*v.*

UNITY CENTER FOR BEHAVIORAL HEALTH,
abn for Legacy Emanuel Hospital & Health Center;
Legacy Emanuel Hospital & Health Center; Legacy Health;
Oregon Health and Science University;
and Oregon Health & Science University Medical Group,
*Defendants-Respondents.*

Multnomah County Circuit Court
21CV01558; A179040

Robert Durham, Judge.

Argued and submitted May 29, 2024.

Nadia H. Dahab argued the cause for appellant. Also on the briefs was Sugerman Dahab. On the reply brief was John M. Coletti and Paulson Coletti Trial Attorneys PC.

Janet M. Schroer argued the cause for respondents Unity Center for Behavioral Health, abn for Legacy Emanuel Hospital & Health Center, Legacy Emanuel Hospital & Health Center, and Legacy Health. Also on the brief were Hillary A. Taylor, Hart Wagner LLP and Keating Jones Hughes PC.

Jay W. Beattie argued the cause for respondents Oregon Health and Science University and Oregon Health & Science University Medical Group. Also on the brief was Katie M. Eichner and Lindsay Hart, LLP.

Before Ortega, Presiding Judge, Powers, Judge, and Hellman, Judge.

POWERS, J.

Affirmed.

Hellman, J., dissenting.

**POWERS, J.**

In this wrongful death action, plaintiff, who is the mother and personal representative of the decedent, J, appeals from a judgment entered for defendants on her claims of negligence. This case arises out of the tragic death of J, who after contemplating jumping from a bridge, had been taken to the psychiatric emergency room at Unity Center for Behavioral Health (Unity). About 10 hours later, Unity allowed J to leave at his request after determining that he did not meet the detention criteria for an involuntary hold, and two days later, he shot himself and died. Plaintiff asserted negligence claims on behalf of J and against defendants, which include Unity, Legacy Emanuel Hospital & Health Center, which operates Unity, and Oregon Health and Science University and Oregon Health & Science University Medical Group, which provide medical staff for Unity. The trial court granted summary judgment to defendants on the ground that ORS 426.335(5) immunized them from liability on plaintiff's claims.

Plaintiff challenges that ruling on appeal, asserting that ORS 426.335(5) does not apply to decisions to not detain a person, that genuine issues of material fact preclude summary judgment, and that Article I, section 10, of the Oregon Constitution bars application of ORS 426.335(5) in this case. As explained below, we construe ORS 426.335(5) and conclude that a decision—whether to detain or not to detain a person—based on the detention criteria in ORS 426.232 is an action that ORS 426.335(5) covers, and that the phrase "good faith, on probable cause" is a standard of honest, subjective belief, based on substantial, objective evidence that more likely than not the person does, or does not, meet the detention criteria. Applying that construction to this case, we conclude that defendants did establish as a matter of law on uncontroverted evidence that ORS 426.335(5) immunizes them from plaintiff's claims. Finally, we conclude that Article I, section 10, does not bar application of ORS 426.335(5) here. Accordingly, we affirm.

## I.   BACKGROUND

Because this case is on review following the trial court's grant of summary judgment to defendants, we review for errors of law and "will affirm if there are no

genuine disputes about any material fact and the moving party is entitled to judgment as a matter of law." *Thompson v. Portland Adventist Medical Center*, 309 Or App 118, 121, 482 P3d 805 (2021). In determining whether a moving party is entitled to summary judgment, "[w]e view the record that was before the trial court in the light most favorable to plaintiff as the party opposing summary judgment, and we 'examine whether no objectively reasonable juror could find in [plaintiff's] favor on the question at issue.'" *Hofer v. OHSU*, 328 Or App 352, 357-58, 536 P3d 989 (2023) (quoting *Beneficial Oregon, Inc. v. Bivins*, 313 Or App 275, 277, 496 P3d 1104 (2021)). Here, because defendants would have had the burden to establish their defense of statutory immunity at trial, *see, e.g.*, *Franke v. Oregon Dept. of Fish and Wildlife*, 166 Or App 660, 666, 2 P3d 921 (2000), "our task on appeal, as circumscribed by our standard of review, is to determine whether the uncontroverted evidence presented by defendant[s] in support of [their] motion for summary judgment is such that all reasonable factfinders would have to find in defendant[s'] favor[.]" *Wieck v. Hostetter*, 274 Or App 457, 470, 362 P3d 254 (2015).

The record on summary judgment in this matter is fairly extensive and consists of declarations, depositions, and medical records. We summarize below the most pertinent facts from that evidence, which were uncontroverted.

J, who was 18 years old and a recent high school graduate, had become increasingly angry, irritated, and withdrawn over the summer. He had briefly attended therapy for behavioral issues at school but stopped going before summer. Around 2:00 a.m. on September 2nd, J had been drinking and was with friends in a rideshare car when he became upset, jumped out of the car, and ran off. J's friends went to plaintiff's house and told J's father what had happened. At the same time, plaintiff texted J. J called plaintiff, asking her to pick him up from the top deck of the Fremont Bridge. Plaintiff found J standing beyond the railing near its outer edge; he was limping and barefoot when he got in the car. J said that he called a crisis hotline twice while on the bridge but was put on hold. J agreed to have plaintiff take him to Unity.

J and plaintiff arrived at Unity at 2:19 a.m. At that time, J refused to sign a consent for treatment but agreed to see a doctor and went to the treatment area willingly. J was also posturing and swearing.

J first met with Loy, who was a triage nurse, Wright, who was a Crisis Intervention Specialist (CIS), and Dr. Do. Security was also present. Loy asked J triage questions and used the Columbia Suicide Severity Rating Scale, which is one of the tools used in developing a suicide risk assessment. J was triggered by the presence of security—he was hostile, verbally aggressive, pounded the floor, and refused to answer questions, except to deny that he was suicidal or homicidal and demanding to leave. Loy believed J was being deceptive when he denied being suicidal.

Do got permission from J to speak with plaintiff. Plaintiff told Do that J called her while he was on the bridge with a plan to jump, and that she learned that J had had a few drinks. She reported that she was not aware of J having prior psychiatric history or suicidal thoughts, but that he had been depressed since April. Do told her that they were going to keep J and conduct a formal evaluation. A couple of hours later, J called her and asked her to pick him up, but she encouraged him to stay.

Do then tried to meet with J again but he would not engage. Do moved J to a room out of the triage area because he continued to be oppositional. He also ordered medications for J, including Ativan for anxiety or to reduce mild agitation, and Zyprexa for agitation. However, Do did not think either were given to J. Do assessed J as having depression and suicidal ideation, reporting that J was "at elevated risk of suicidal behavior while in the psychiatric emergency service due to uncooperative behavior." He recommended reassessment for suicidality after J had a period of sobriety and to consider admission if he continued to show an imminent danger.

Wright then met with J alone, sometime before 4:47 a.m., and J was able to engage with her. J told Wright that he had been depressed since April, was hiding and lying about it, and was glad to stop lying. J was tearful when

speaking about recent stressful events of his breakup with his girlfriend and having learned she kissed his friend. J reported that he was afraid to take medicine because his father had a negative experience with it, that he had prior negative experiences with therapy and stopped going, that he did not get along with his father, and that he does not do well with authority figures. J was unable to safety plan with Wright and reported that he was still feeling suicidal but was willing to stay until he felt better. J also told Wright that, when he was on the side of the bridge, he was thinking about jumping, but he was afraid of heights and was not going to jump. Wright told J that he could not leave Unity until he was stable, feeling better, and had a safety plan in place, which would consider treatment and medications. Wright reported that J was aggressive and provocative when he felt vulnerable and scared and responded more positively to having choices and feeling in control. J also had a sprained ankle and bruises on his right knuckles from hitting a wall.

Wright spoke with J again shortly after 7:30 a.m. before she was leaving. J had not slept and was anxious to leave but he was not agitated and was agreeable to talk to the next team about outpatient treatment and medication. In her deposition, Wright agreed that J taking steps to jump off a bridge, which would have been lethal, increases the severity of the risk of suicide. She also agreed that it could make a difference in assessing a patient whether they self-interrupted a suicide attempt or it was interrupted by another person.

After a shift change in the morning, J's team included Dr. Bereiter, CIS Keepers, and a nurse, Kavanaugh. Do communicated to the team that J came in agitated and uncooperative, but he had a good conversation with Wright. Do thought it likely that at least part of J's behavior was due to intoxication.

Kavanaugh met with J around 8:00 a.m. for an initial assessment. J requested a discharge, and she told him that he had a high level of risk for suicidal ideation, that he needed a safety plan before he could leave, and that he needed to be patient with the process. A short time later, J was cooperative with Kavanaugh when she returned. He reported feeling a lot better after some time to think and decompress, and that he

was looking forward to starting college. He denied current suicidal or homicidal ideation. He also reported that he called plaintiff. Kavanaugh reported that J appeared ambivalent about engaging in community-based services.

Sometime before 10:00 a.m., Keepers and Bereiter evaluated J. Keepers reported that J wanted to be discharged and was pleasant, cooperative, and engaged in the interview and was open to starting therapy and interested in medication. J reported struggling with suicidal thoughts all his life, but never made a suicide attempt until he was close to jumping off the bridge. J stated that his actions on the bridge were related to feeling betrayed and alcohol use. J also identified that he had really good friends he could talk to and that he was close to plaintiff, and he was looking forward to starting college. Keepers recognized that there was a change in J's behavior in a short amount of time. However, Keepers did not believe that J was deceiving them.

Bereiter and Keepers discussed with J why he did not want inpatient treatment and determined that J communicated an understandable reason that the institutional setting made him feel on edge and that it would not help. They discussed intensive outpatient treatment as an option and discussed possible barriers to treatment, and determined that that option was a good one for J. J agreed to that recommendation. Bereiter discussed antidepressants with J, and thought J's reason for refusing to take them at Unity was sound. Bereiter had informed J that there were different types of antidepressants, so even if J's father had side effects to one kind, there were other options. J had not been aware of that and was willing to take it, but would rather wait until he started the intensive outpatient treatment. Bereiter thought J was sincere in the conversations about wanting treatment.

Around 10:00 a.m., Kavanaugh reported that, while talking to Keepers, J became anxious and knocked on the window of the provider room and stated, "he wanted to leave, was being held against his will and threatened with a hospital hold last night if he did not cooperate." She explained to J that, if he could not keep himself safe and refrain from

threatening others, it would be difficult to allow him to leave as it would not be safe.

Keepers also conducted safety planning with J. He reported that J was able to create a safety plan, including identifying his triggers for feeling suicidal and listing people he can call for help, and that J no longer presented an imminent risk to self or others. J understood he could return to Unity if needed. While planning, J was restless and did some push-ups.

Keepers and Bereiter discussed everything in detail, and they determined that J's acute phase of suicidality had passed and that he was not at imminent risk of danger to self or others, and he credibly agreed to a reasonable safety plan that included a high level of outpatient care. Bereiter agreed that J started at Unity as a high risk for suicide, but several protective factors he displayed had started to lower that risk, including opening up to Wright and in his interview with Bereiter and Keepers, calling the crisis line while on the bridge and persisting in asking for help by then calling plaintiff, agreeing to go to Unity, his reported close relationship with plaintiff, and desire to address his issues with his father. Keepers testified that "if we believed that he was lying to us to get out of the hospital or was actually at imminent risk of harm to self or others, we could have and would have placed him on a Notice of Mental Illness Hold."

Keepers contacted plaintiff and told her in detail about the safety plan and told her that starting the intensive outpatient program the next morning was a reasonable option for J. Keepers advised her to call the county crisis line if J refused treatment or disappeared and discussed how to identify warning signs and keep J safe. Plaintiff told Keepers that she would make sure her car was available for J to get to outpatient treatment the next morning.

Kavanaugh's last interaction with J was at around noon when she walked J to the lobby to meet plaintiff. She reviewed the plan with J and plaintiff, and she gave J the follow-up referral for intensive outpatient treatment. Kavanaugh agreed with the decision to allow J to leave at that time; if she had not thought it was safe to do, she would

not have discharged him. She was not, however, part of the team in charge of that decision.

Both Keepers and Bereiter submitted declarations that each had concluded that J did not meet the criteria for an involuntary psychiatric hold and that their assessments, evaluations, and conclusions about J were made in good faith and without malice.

When plaintiff picked up J, she thought he was "not normal," in that he had a blank look and was not making eye contact. J reported that he did not get much sleep and was agitated from the medication that they gave him and wanted to go home. Plaintiff took J home, and he slept for the rest of the day. After J woke up, he told plaintiff he was not going to outpatient treatment the next morning but agreed to make an appointment with his pediatrician. The following day J stayed at home in his room.

The next morning, on September 4th, J left the house without talking to plaintiff. Plaintiff and J exchanged texts during the day, including J asking her for his social security number so he could replace his lost driver's license. That afternoon, J texted several people and called his parents to say goodbye. J killed himself in a parking lot using a firearm that he had purchased with his newly replaced driver's license.

Plaintiff, as the personal representative of J's estate, sued defendants for wrongful death, alleging four specifications of negligence that led to J's death:

"(a) In failing to adequately assess the severity of [J's] suicidal ideation;

"(b) In discharging [J] following an interrupted suicide attempt approximately 10 hours after admitting him for supervision and treatment;

"(c) In failing to adequately assess the severity of [J's] suicidal ideation in addition to long term stressors prior to discharge; and

"(d) In failing to commit [J] to in-patient treatment so as to better evaluate the severity of [J's] psychological condition and confirm that it was safe to discharge him."

Defendants moved for summary judgment, arguing that ORS 426.335(5) barred plaintiff's claims as a matter of law because it immunized defendants from those claims. The trial court agreed, granted defendants' motion for summary judgment, and entered a general judgment dismissing plaintiff's claims. Plaintiff timely appeals from that judgment.

## II.   ANALYSIS

On appeal, plaintiff makes three distinct arguments in support of her assignment of error challenging the trial court's grant of summary judgment: (1) ORS 426.335(5), by its terms, does not apply to a practitioner's decision to not detain a person and not approve them for emergency care; (2) genuine issues of material fact exist that foreclose summary judgment; and (3) the remedy clause of Article I, section 10, forecloses application of ORS 426.335(5). We address each of those contentions in turn.

A.   *Does the immunity in ORS 426.335(5) apply to a decision to not detain a person?*

To address plaintiff's argument that ORS 426.335(5) does not apply here, we must construe the terms of that statute to determine the legislature's intent. To do so, we apply our familiar methodology of considering the text of the statute in context, along with any legislative history that we determine is useful to our analysis. *State v. Gaines*, 346 Or 160, 171-72, 206 P3d 1042 (2009).

We start with the text, which is "the best indicator of legislative intent." *Oregon Trucking Assns. v. Dept. of Transportation*, 364 Or 210, 220, 432 P3d 1080 (2019). ORS 426.335(5) provides:

"The following limitations on liability are applicable to actions and proceedings within this chapter and ORS 430.397 to 430.401:

"* * * * *

"(5)   A licensed independent practitioner, hospital or judge may not be held criminally or civilly liable for actions pursuant to ORS 426.228, 426.231, 426.232, 426.234 or 426.235 if the licensed independent practitioner, hospital

or judge acts in good faith, on probable cause and without malice."

The relevant statutes that defendants could have been acting "pursuant to" in this case are ORS 426.232 and ORS 426.234, which we set out in some detail for context. First, ORS 426.232 provides:

"(1)  If a licensed independent practitioner believes a person who is brought to a hospital or nonhospital facility by a peace officer under ORS 426.228 or by an individual authorized under ORS 426.233, or believes a person who is at a hospital or nonhospital facility, is a danger to self or others and is in need of emergency care or treatment for mental illness, and the licensed independent practitioner is not related to the person by blood or marriage, the licensed independent practitioner may do one of the following:

"(a)  Detain the person and cause the person to be admitted or, if the person is already admitted, cause the person to be retained in a hospital where the licensed independent practitioner has admitting privileges or is on staff.

"(b)  Approve the person for emergency care or treatment at a nonhospital facility approved by the authority.

"(2)  When approving a person for emergency care or treatment at a nonhospital facility under this section, the licensed independent practitioner shall notify immediately the community mental health program director in the county where the person was taken into custody and maintain the person, if the person is being held at a hospital, for as long as is feasible given the needs of the person for mental or physical health or safety. However, under no circumstances may the person be held for longer than five judicial days."

The involuntary detention and admission in a hospital under ORS 426.232(1) is also referred to as a "hospital hold." *See* OAR 309-033-0210(30) (defining "hospital hold" as "the notice of mental illness submitted to the court pursuant to ORS 426.232(1) by one licensed independent practitioner * * * and by which a person is physically detained in the community hospital").

Second, ORS 426.234 sets out what must occur when a person is involuntarily detained at a hospital or

nonhospital facility under ORS 426.232 or ORS 426.233. In describing the various requirements that a licensed independent practitioner must do, the statute specifically provides:

> "If, at any time prior to the hearing under ORS 426.070 to 426.170, the licensed independent practitioner responsible for a person admitted or retained under ORS 426.232 determines that the person is not a danger to self or others and is not in need of emergency care or treatment for mental illness, the licensed independent practitioner may release the person from the detention authorized by ORS 426.232. The licensed independent practitioner shall immediately notify the circuit court notified under this subsection and the community mental health program director of the person's release from detention."

ORS 426.234(2)(c).

On appeal, plaintiff argues that ORS 426.335(5) does not cover a practitioner's decision to not detain a person and to decline to approve the person for emergency care, because neither ORS 426.232 nor ORS 426.234 list as an action a decision to release a person prior to initiating a hospital hold. Plaintiff asserts that her reading is the correct one because the requirement that a practitioner have "probable cause" makes sense only when the action taken is to deprive a person of their liberty. Plaintiff also asserts that legislative history supports her reading of the statute.

Defendants respond that ORS 426.232 contemplates both detaining a person or not detaining a person, depending on if the person meets the hospital hold criteria. Defendants also point to ORS 426.234(2)(c) and ORS 426.228, both of which are provisions covered by the immunity in ORS 426.335(5) and both of which address release of a person if they do not meet the detention criteria. Defendants also offer legislative history to support their position.

The parties' arguments require us to not only look at ORS 426.335(5) but also to examine ORS 426.232, and, if necessary, ORS 426.234. In making their respective arguments, the parties agree on the meaning of the term "pursuant to." We also agree with the parties that "pursuant to" in ORS 426.335(5) means "in conformance to or agreement with." *Webster's Third New Int'l Dictionary* 1878 (unabridged

ed 2002); *see also Jones v. Douglas County*, 247 Or App 81, 93, 270 P3d 278 (2011) (explaining that "'pursuant to' means '[i]n compliance with; in accordance with; under' or '[a]s authorized by; under'" (quoting *Black's Law Dictionary* 1272 (8th ed 2004)). In addition, "action," as most relevant here, is "a thing done : DEED" and in its plural form, actions, is ": BEHAVIOR, CONDUCT." *Webster's* at 21. The parties disagree about whether a practitioner's decision to not detain a person, who is requesting to leave, based on a failure to meet the criteria in ORS 426.232 falls within "actions pursuant to" ORS 426.232, such that immunity under ORS 426.335(5) applies.[1] We conclude that it is.

Under ORS 426.232(1), a practitioner may either detain a person or cause a person to be retained at a hospital only if the practitioner "believes a person who is at a hospital or nonhospital facility, is a danger to self or others and is in need of emergency care or treatment for mental illness." Because the person may be detained only if the criteria are met, the statute necessarily contemplates that the person will not be detained if the practitioner does not believe that the person meets the criteria. That legislative intent is confirmed by the operation of both ORS 426.234(2)(c) and ORS 426.228(4).

First, ORS 426.234(2)(c) provides that, after detention and before a hearing, if the practitioner believes that the person no longer meets the criteria, the practitioner "may release the person from the detention authorized by ORS 426.232." Second, ORS 426.228(4), provides that, when a peace officer takes a person into custody and delivers the person to a facility,

"the licensed independent practitioner shall proceed under ORS 426.232, otherwise the person may not be retained in custody. If the person is to be released from custody, the peace officer or the community mental health program

---

[1] We note that plaintiff has not alleged that defendants failed to take any action at all under the criteria ORS 426.232. *Cf. Scovill v. City of Astoria*, 324 Or 159, 168, 921 P2d 1312 (1996) (holding that, where the police took no action when a visibly intoxicated person left in their care walked out of the police station, the failure to take action under *former* ORS 426.460(1) (1993), *renumbered* ORS 430.399 (1995), did not come within the immunity provision of *former* ORS 426.470 (1993), *renumbered* ORS 430.401 (1995)). Rather, plaintiff alleges that defendants were negligent in their evaluation of and decision to not detain J.

director shall return the person to the place where the person was taken into custody ***."[2]

Thus, looking at relevant context within the larger statutory framework, both ORS 426.234(2)(c) and ORS 426.228(4) confirm that ORS 426.232 necessarily contemplates two paths—detaining the person if the person meets the criteria or not detaining the person if the person does not meet the criteria.

A practitioner evaluating a person to determine whether that person is a danger to self or others and is in need of emergency care or treatment is an action pursuant to ORS 426.232, because without first making that determination, a practitioner is not permitted to take any other action listed in ORS 426.232. In other words, it does not make logical sense that the initiating action of evaluating whether a person meets the detention criteria in ORS 426.232 could not be an action in conformance or in compliance with ORS 426.232, when that evaluation is the condition precedent to the authority to deprive a person of their liberty based on ORS 426.232. When we read a statute to effectuate the plain language used by the legislature, that is not merely an idea that leads to the consultation of dictionaries for individual words. It is an idea that, when we read a statute, we apply a plain understanding of how any person reading the statute would understand the statute to operate based on the words used. *See, e.g.*, *State v. Gonzalez-Valenzuela*, 358 Or 451, 461-62, 365 P3d 116 (2015) (explaining that "a statute's plain meaning is frequently more than the sum of its individually defined terms").[3]

---

[2] Contrary to the dissent's view, ORS 426.228(4) and ORS 426.234(2)(c) do not demonstrate that the legislature intended that ORS 426.232 would not cover "release" decisions. *See* 349 Or App at 491 (Hellman, J., dissenting). As used in those statutes, "release" means a release from custody. A decision not to involuntarily hold someone who does not meet the criteria in ORS 426.232 is not a "release," as such, and adding the term release to that statute would not make sense within the statutory framework. However, those statutes do confirm that a person may not be detained if the person does not meet the detention criteria. That is, those statutes confirm that ORS 426.232 necessarily contemplates two different paths depending on if the practitioner believes the person meets the detention criteria or not.

[3] In recognizing the importance of critically examining how particular definitions of words and phrases fit into the context of the statutory framework, the court explained:

Here, we conclude that applying that plain meaning approach requires us to conclude that a practitioner evaluating whether a person meets the detention criteria in ORS 426.232(1) is an action "pursuant to" that statute. We disagree with the dissenting opinion that "actions pursuant to" ORS 426.232 can be a reference to only the precise "action" words used in ORS 426.232, when none of those actions are statutorily permissible without first taking the action of evaluating whether a person meets the detention criteria. *Cf. Deming v. Mt. Hood Community Mental Health Center*, 128 Or App 164, 875 P2d 484, *rev den*, 320 Or 131 (1994) (rejecting the plaintiff's argument that *former* ORS 426.280(2) (2001), *renumbered* ORS 426.335(2) (2003), immunized only the act of conducting the investigation and did not immunize the consequences of negligence in performing the evaluation).[4]

We also are not persuaded by plaintiff's assertion that the legislature did not intend for ORS 426.335(5) to extend to the decision to not detain a person based on the requirement that the practitioner act on probable cause. First, the immunity requirement that the practitioner "act[] in good faith, on probable cause" does not suggest that the legislature intended that decisions to not detain are not covered. Rather, it suggests only that whatever the action taken pursuant to the listed statutes must be made in good

---

"[A] statute's plain meaning is frequently more than the sum of its individually defined terms. Dictionary definitions lack context and often fail to capture the nuanced connotations conveyed by the normal use of a term in a particular context. Those more nuanced connotations may represent the plain meaning of a term in context even though those connotations result from tacit knowledge, accumulated experience, and common sense that are not reflected well—if at all—in dictionary definitions. As a result, dictionaries are only the starting point for our textual analysis and should not be used as the ending point."

*Gonzalez-Valenzuela*, 358 Or 461-62 (internal quotation marks and citations omitted).

[4] In rejecting the plaintiff's argument that asserted a narrow reading of the immunity provided by *former* ORS 426.280(2) (2001), we explained:

"No purpose would be served by providing immunity in ORS 426.280(2) only for the precise act that other provisions of the statutes require to be performed. Immunity for that act inheres in the statutory mandate. The only plausible reason for the separate immunity provision is to insulate the consequences of the required act, rather than the act itself."

*Deming*, 128 Or App at 168.

faith and on probable cause. We would have to read into the text of ORS 426.335(5) that "actions pursuant to" the listed statutes include only those actions that directly restrain a person's liberty to read that statute as plaintiff requests. The insertion of that concept would be contrary to the legislature's apparent intent of immunizing conduct under the entire framework covered by the listed statutes, because those listed statutes specifically set out actions to which we also would not typically apply the concept of probable cause. *See, e.g.*, ORS 426.228 (requiring a peace officer "prepare a written report and deliver it" to the practitioner treating the person taken into custody, if transport will take longer than hour "obtain, if possible, a certificate" from a practitioner, "return" a person released from custody, because they could not be retained under ORS 426.232, to the place they were taken into custody); ORS 426.231 (requiring a practitioner that holds a person for transportation to a facility to "prepare a written statement" that supports the transport); ORS 426.234 (requiring a practitioner to "inform" a person on a hold of their rights, to examine the person, and "[s]et forth, in writing" the person's condition; requiring the practitioner to "contact" the community mental health program director and "notify" the circuit court); ORS 426.235 (permitting transfer of a person in custody when the person's treating practitioner agrees to the transfer). The use of the term probable cause in ORS 426.335(5) is not determinative of the types of actions that the limitation of liability covers, and we will not read into ORS 425.335(5) a narrowing of the meaning of the word "actions" to only those actions that restrain a person's liberty, when "actions" otherwise broadly means "a thing done" or "conduct." *Webster's* at 21; *see also, e.g.*, ORS 174.010 (explaining that, in construing a statute, a court is "not to insert what has been omitted, or to omit what has been inserted").

Second, applying immunity to both possible outcomes—*viz.*, a decision to detain or a decision to not detain—from a practitioner applying the detention criteria in ORS 426.232 is in harmony with the legislature's intention to strike an appropriate balance in the civil commitment statutes between the need for involuntary commitment and the liberty interest of the mentally ill, because applying

immunity only to a decision to detain a person would have the effect of encouraging practitioners to err on the side of detention. *See, e.g., State v. J. W. H.*, 202 Or App 526, 534, 123 P3d 370 (2005) (recognizing the tension between protecting personal liberty and the provision of medical help to persons with mental illness). That one-sided incentive does not further the legislative intention to strike an appropriate balance. In light of the legislature's intention in creating a civil commitment process that begins with an informed determination of whether a person is a danger to self or others and in need of emergency care, the legislature would not have intended for the limitation on liability to flow in only one direction such that the availability of that liability limitation would become part of the decision-making process whether to detain a person.

We have reviewed the legislative history offered by the parties and it does not alter our view of the text and context of ORS 426.335(5). *See Gaines*, 346 Or at 172 (clarifying that "a party seeking to overcome seemingly plain and unambiguous text with legislative history has a difficult task before it"). Accordingly, we conclude that ORS 426.335(5) covers both the act of detaining and not detaining a person pursuant to the criteria provided in ORS 426.232(1).

B.   *Did defendants establish ORS 426.335(5) immunity as a matter of law?*

1.   *The legal standard set by ORS 426.335(5).*

Having determined that ORS 426.335(5) does apply to a decision to not detain made pursuant to ORS 426.232, we turn to plaintiff's assertion that defendants did not establish that they were entitled to summary judgment. Again, that statute provides that a practitioner or hospital cannot be held criminally or civilly liable for actions pursuant to ORS 426.232 if the practitioner or hospital "acts in good faith, on probable cause and without malice." ORS 426.335(5). Plaintiff argues that defendants did not establish as a matter of law either "good faith" or "probable cause."[5] Because plaintiff's arguments raise issues of

---

[5] Plaintiff does not assert that any defendant acted with malice. Thus, we do not address that requirement.

statutory interpretation as to the meaning of those terms, we first construe ORS 426.335(5) using our methodology under *Gaines* before turning to whether the record supports the trial court's grant of summary judgment to defendants.

Both parties agree that "probable cause," based on our case law, should be defined by analogy to ORS 131.005(11), which defines "probable cause" for the criminal code as "a substantial objective basis for believing that more likely than not an offense has been committed and a person to be arrested has committed it." In *State v. Smith*, 71 Or App 205, 211, 692 P2d 120 (1984), we applied that definition by analogy to the term "probable cause" in ORS 426.070(3) and concluded that it meant "a substantial objective basis for believing that more likely than not a person is mentally ill."

We are not aware of any reason why we should not apply the reasoning in *Smith* to ORS 426.335(5). The use of the term probable cause by the legislature throughout ORS chapter 426, but without separately defining that term for ORS chapter 426, suggests that the legislature intended that the well-established meaning of probable cause, which is reflected in the criminal code definition, would apply to the civil commitment statutory framework. Because the text of ORS 426.335(5) refers to actions taken pursuant to the listed statutes as the acts that need to be based on probable cause, the precise contours of the probable cause definition must be grounded in the act at issue in the particular case. As it applies here then, probable cause is a substantial objective basis for believing that more likely than not the person did not meet the criteria for detention under ORS 426.232. Again, by analogy, we review for legal error whether the facts known to the practitioners at the time of their decision establish probable cause. *See State v. Husk*, 288 Or App 737, 739, 407 P3d 932, *rev den*, 362 Or 665 (2017) (explaining that whether the facts establish probable cause for a traffic stop is a question of law reviewed for legal error).

Turning to "good faith," in the briefing, plaintiff asserted that "good faith" in ORS 426.335(5) included an objective component, while defendants asserted it was only a subjective standard of "good faith belief." At oral argument,

however, plaintiff conceded that "good faith" is a subjective standard. We agree with the parties that it is a subjective, state of mind standard.

"Good faith" is not defined for purposes of ORS chapter 426, and we thus start by examining its common, ordinary meaning, using guidance from dictionaries in use at time. *See State v. Perry*, 336 Or 49, 53, 77 P3d 313 (2003) (explaining that in interpreting words of a statute enacted many years ago, a court "may seek guidance from dictionaries that were in use at the time"); *see also Comcast Corp. v. Dept. of Rev.*, 356 Or 282, 296 n 7, 337 P3d 768 (2014) (observing that, notwithstanding the frequency with which the Supreme Court cites modern editions of *Webster's* to determine the plain meaning of statutory terms, "[i]n consulting dictionaries, * * * it is important to use sources contemporaneous with the enactment of the statute"). *But see State v. James*, 266 Or App 660, 667 n 3, 338 P3d 782 (2014) (explaining that "[b]ecause the content of *Webster's*—excluding the addenda section—has remained static since 1961, in general, it is appropriate to treat it as a contemporaneous source for statutes dating from at least that point forward"). The limitation of liability in relation to involuntary hospitalization for mental illness was first enacted in 1969. Or Laws 1969, ch 371, § 1 (enacting *former* ORS 426.175 (1991), *repealed by* Or Laws 1993, ch 484 § 27, which included the liability limitation for physicians and hospitals, "provided he acts in good faith, on probable cause and without malice"). At that time, *Webster's* defined "good faith," as relevant here, as "a state of mind indicating honesty and lawfulness of purpose : * * * belief that one's conduct is not unconscionable or that known circumstances do not require further investigation * * *." *Webster's Third New Int'l Dictionary* 978 (unabridged ed 1961). *Accord Black's Law Dictionary* 822 (4th ed rev 1968) (defining "good faith," in relevant part, as "[h]onesty of intention, and freedom from knowledge of circumstances which ought to put the holder upon inquiry"). That definition suggests that good faith is a subjective standard, because it is a "state of mind" based in "honesty" and a "belief" that conduct is not unconscionable or that circumstances do not require further investigation.

In addition, as we have discussed above, the legislature intended to impose a "substantial objective basis" requirement through its reference to "probable cause." Although good faith can have an objective component in certain contexts, *see Klamath Off-Project Water Users, Inc. v. PacifiCorp*, 237 Or App 434, 445-46, 240 P3d 94 (2010), *rev den*, 349 Or 602 (2011) (discussing the common-law duty of good faith and fair dealing inherent in contracts), it seems unlikely that "good faith," as used in this context, would also include an objective standard in addition to the objective standard of probable cause. Thus, we conclude that "good faith," as used in ORS 426.335(5), raises an issue of fact. *See, e.g.*, *Mouktabis v. Oregon City Police Dept.*, 337 Or App 226, 563 P3d 1003 (2025) (addressing good faith for purposes of peace officer immunity statute for arrests).

Putting that all together, "in good faith, on probable cause" is a standard requiring a subjective, state of mind of an honest and lawful purpose, based on substantial, objective evidence that the person more likely than not did, or did not, meet the criteria in ORS 426.232.[6] Good faith is a question of fact, while probable cause is a question of law that is evaluated based on the totality of the facts known to the practitioner at the time the decision was made. Thus, in this case, the question is not whether defendants' evaluation of J fell below a standard of care. The question is whether defendants, in good faith, determined that, at the time of the evaluation, there was a substantial objective basis for believing that J, more likely than not, was not a danger to self or others and in need of emergency treatment.

2. *Application of the legal standard set by ORS 426.335(5).*

Having addressed the meaning of "acts in good faith, on probable cause," we turn to whether defendants established that they met that standard as a matter of law on uncontroverted evidence.

---

[6] Although we are not bound by any federal court's interpretation of an Oregon statute, *Burley v. Clackamas* County, 298 Or App 462, 467, 446 P3d 564, *rev den*, 365 Or 721 (2019), our conclusion is in alignment with how the United States District Court for the District of Oregon has interpreted ORS 426.335(5), when it rejected an identical argument raised by the plaintiff in *Cederberg v. Legacy Health*, 2020 WL 5809991, *4-5, (D Or Sept 28, 2020).

Plaintiff's argument that a genuine issue of material fact exists, defeating summary judgment, is primarily based on the following: (1) defendants did not act in good faith because they had information—including that J had a history of suicidal ideation, a history of noncompliance with treatment, a recent suicide attempt on the bridge, and had aggressive behavior and incredibly denied suicidality when he first arrived—that J, if released, would be a danger to himself or others and needed emergency treatment; and (2) defendants lacked probable cause because there was not a substantial objective basis on which to conclude that J was no longer a danger and in need of emergency treatment because J's behavior was a sudden change that occurred after he was told what he needed to do to be allowed to leave, suggesting J was deceptive and not credible.

Defendants respond that both Keepers and Bereiter provided articulable, good faith reasons why J did not meet the detention criteria under ORS 426.232. Defendants also assert that plaintiff presented no evidence on summary judgment that refuted the practitioners' articulated good faith. As to probable cause, defendants argue that, under the totality of the circumstances, defendants had a substantial objective basis on which to believe more likely than not that J did not meet the criteria in ORS 426.232.

We primarily consider the following in our evaluation. When J arrived at Unity he was aggressive, unable to engage with the providers, and denied any suicidality. However, J's behavior changed when he was no longer confronted with security and had time to calm down. In his meeting with Wright, which was sometime before 4:47 a.m., he was able to talk about how he ended up at Unity and identify stressors and triggers and agreed to consider outpatient treatment and to stay voluntarily overnight. Around 7:00 a.m., Do informed Keepers and Bereiter about J's prior behavior but also stated that J had a good talk with Wright and some of his behavior was likely due to intoxication. When J met with Keepers and Bereiter, he was able to engage and talk about his stressors and triggers. J also identified people in his life he could reach out to for help. Keepers and Bereiter both testified that they found J to be credible, reasonable,

and sincere when he met with them and in his agreement to intensive outpatient treatment. They also determined that his acute suicidality had passed. Bereiter articulated several protective behaviors that J exhibited that lowered his suicide risk level, including his trying to call the crisis line when he was on the bridge and persisting with seeking help when he called plaintiff, his opening up with Wright, his opening up to Keepers and Bereiter, his ability to safety plan, and his looking forward to college.

Plaintiff did not submit evidence that controverted any of defendants' evidence. Instead, plaintiff points to facts that she argues should have caused defendants to inquire further or to not believe that J was sincere. On this record, we are unpersuaded by that argument. Although after calming down, J continued to display restlessness and, at times, loudly insisted that he be discharged, those behaviors alone do not raise a genuine issue of material fact that Keepers and Bereiter were not acting in good faith and on probable cause. And, although J reported long-term suicidal ideation, he also reported that he never before attempted suicide and stated that his actions on the bridge were due to feeling betrayed and alcohol use—an acute situation. Plaintiff also reported to Do that J did not have any prior psychiatric issues or suicide attempts. Keepers and Bereiter articulated concrete facts that supported their good faith belief that J did not meet the criteria for involuntary detention because his acute suicidality had passed, he could appropriately safety plan, and they thought J's agreement to treatment and medication was sincere.

In sum, on this record, defendants did establish that the uncontroverted evidence presented by defendants "is such that all reasonable factfinders would have to find in defendant[s'] favor" on good faith. *Wieck*, 274 Or App at 470.

We also conclude that, under the totality of the circumstances based on the uncontroverted evidence, defendants established, as a matter of law, that their good faith decision to not involuntarily detain J was based on probable cause. *Husk*, 288 Or App at 739 (addressing probable cause). Plaintiff's argument is essentially that a practitioner could have weighed the facts differently, not believed J's change

in behavior as credible, and determined that J did meet the criteria for involuntary detention. That argument, however, does not raise an issue of fact. The facts in this record are uncontroverted, including that Keepers and Bereiter found J to be credible and sincere. As a result, the only question before us is if the uncontroverted evidence of what Keepers and Bereiter knew provides a substantial, objective basis for their decision to not involuntarily detain J because he did not meet the criteria in ORS 426.232. We conclude that, on this record, the evidence does establish probable cause as a matter of law.

C.  *Does Article I, section 10, bar application of ORS 426.335(5)?*

In her remaining argument, plaintiff argues that applying ORS 426.335(5) in this case unconstitutionally limits plaintiff's right to a remedy under Article I, section 10, under the analysis set out in *Horton v. OHSU*, 359 Or 168, 376 P3d 998 (2016).

The remedy clause in Article I, section 10, provides that "every man shall have a remedy by due course of law for injury done him in his person, property, or reputation." The Supreme Court has explained that the analysis under Article I, section 10, "focuses on the state of the common law at the time that the statute in question was enacted, not when the constitution was adopted." *Bonner v. American Golf Corporation of California, Inc.*, 372 Or 814, 821, 558 P3d 812 (2024) (citing *Horton*, 359 Or at 180). In *Horton*, the court identified three general categories of legislation that it had confronted when applying Article I, section 10:

"First, when the legislature has not altered a duty but has denied a person injured as a result of a breach of that duty any remedy, our cases have held that the complete denial of a remedy violates the remedy clause. * * *

"Second, the court has recognized that the reasons for the legislature's actions can matter. For example, when the legislature has sought to adjust a person's rights and remedies as part of a larger statutory scheme that extends benefits to some while limiting benefits to others, we have considered that *quid pro quo* in determining whether the reduced benefit that the legislature has provided an

individual plaintiff is 'substantial' in light of the overall statutory scheme. ***

"Third, the legislature has modified common-law duties and, on occasion, has eliminated common-law causes of action when the premises underlying those duties and causes of action have changed. In those instances, what has mattered in determining the constitutionality of the legislature's action is the reason for the legislative change measured against the extent to which the legislature has departed from the common law."

*Horton*, 359 Or at 219-20. The court explained that, "in deciding whether the legislature's actions impair a person's right to a remedy under Article I, section 10, we must consider the extent to which the legislature has departed from the common-law model measured against its reasons for doing so." *Horton*, 359 Or at 220; *see also Crandall v. State of Oregon*, 374 Or 699, 704-14, 584 P3d 1197 (2026) (discussing *Horton* and post-*Horton* Article I, section 10, cases).

Here, plaintiff asserts that, at the time the legislature first enacted the immunity law, the common law recognized a cause of action and remedy for the alleged malpractice of mental health providers. Plaintiff argues that ORS 426.335(5) does not alter the common-law duty owed, but limits or eliminates the remedy for a breach of that duty, and, thus, is prohibited by Article I, section 10, because it was not enacted as part of a quid pro quo.

We disagree with plaintiff's argument. ORS 426.335(5) was enacted as part of a comprehensive statutory framework that addresses the involuntary civil commitment of persons with a mental illness. Here, defendants evaluated J under the criteria in ORS 426.232 and determined that he did not meet that criteria and could not be involuntarily detained at the hospital. Contrary to plaintiff's argument, plaintiff's complaint is not premised on common-law negligent provision of mental health care; it is premised on defendants' alleged negligent failure to detain J involuntarily—or against his will—for mental health treatment. We are not aware of any common-law duty of hospitals or practitioners to hold a person against their will for the provision of mental

health treatment, and plaintiff points to none.[7] As a result, the premise of plaintiff's complaint is necessarily based on the civil commitment statutes, because that is the source of authority for defendants to detain a person against their will for mental health treatment.

The comprehensive civil commitment framework seeks to balance the liberty interest of persons with mental illness with the interest of the state in providing treatment to those persons. *See J. W. H.*, 202 Or App at 534. As part of that comprehensive framework, ORS 426.335(5) sets out the limits on liability of the institutions, peace officers, mental health practitioners, and judges that must determine whether a person meets the criteria for involuntary civil commitment. In that limitation of liability, the legislature set out the duty owed to persons with mental illness when the covered institutions and persons act pursuant to the identified civil commitment statutes, *viz.*, the action must be in good faith, on probable cause, and without malice. At least as it applies here, because the legislature created the source of authority for hospitals to detain persons against their will for mental health treatment, the legislature could also set out the limits of liability that attaches in exercising that authority, without running afoul of the Article I, section 10, remedy clause. *See also Estate of James Ritchie v. Helbig*, 347 Or App 37, 46, 586 P3d 428 (2026) (concluding that "given that wrongful death actions are not cognizable under the common law, the statutory *quid pro quo* creating such a cause of action, and the history of limitations on damages recoverable in wrongful death cases, ORS 31.710(1) does not violate Article I, section 10").

Beyond arguing that ORS 426.335(5) is not part of a comprehensive statutory quid pro quo, plaintiff's arguments do not provide us with any basis on which to conclude that application of ORS 426.335(5) to this case is barred by

---

[7] Plaintiff does point to *Gardner v. OHSU*, 299 Or App 280, 450 P3d 558 (2019), which involved a wrongful death negligence action brought against mental health practitioners after an outpatient completed suicide. That case held that comparative fault applied in such cases and that the defendants had alleged a viable defense of comparative fault. We do not think that case is applicable here, where plaintiff's complaint is premised on defendants' negligent failure to involuntarily detain J under the civil commitment statutes and not based on outpatient treatment of J.

Article I, section 10. Accordingly, we decline to conduct any further analysis and reject plaintiff's Article I, section 10, argument.

In sum, based on the foregoing, the trial court did not err in granting summary judgment to defendants based on ORS 426.335(5).

Affirmed.

**HELLMAN, J.,** dissenting.

I respectfully dissent. When defendants allowed J to leave Unity on September 2, 2019, they were not acting "pursuant to" ORS 426.232(1)(a), which by its terms applies only to decisions to "detain," "admit[]," or "retain[]" a person in a hospital. As a result, defendants are not entitled to immunity under ORS 426.335(5), which provides immunity only for "actions pursuant to" ORS 426.232.[1]

When tasked with interpreting a statute, our "paramount goal" is to "discern[] the legislature's intent." *State v. Gaines*, 346 Or 160, 171, 206 P3d 1042 (2009); *see also* ORS 174.020(1)(a) ("In the construction of a statute, a court shall pursue the intention of the legislature if possible."). To accomplish that goal, we begin by examining the text and context of the statutes at issue because "there is no more persuasive evidence of the intent of the legislature than the words by which the legislature undertook to give expression to its wishes." *Gaines*, 346 Or at 171 (internal quotation marks omitted).

Following that framework, I start with the text of the two statutes at issue in this case: ORS 426.335(5) and ORS 426.232(1). ORS 426.335(5) provides:

"A licensed independent practitioner, hospital or judge may not be held criminally or civilly liable for actions pursuant to ORS 426.228, 426.231, 426.232, 426.234 or 426.235 if the licensed independent practitioner, hospital or judge acts in good faith, on probable cause and without malice."

And ORS 426.232(1) provides:

---

[1] ORS 426.335(5) references four other statutes; however, none of those statutes possibly apply to defendants' actions in this case. I therefore focus my analysis on ORS 426.232.

"If a licensed independent practitioner believes a person who is brought to a hospital or nonhospital facility by a peace officer under ORS 426.228 or by an individual authorized under ORS 426.233, or believes a person who is at a hospital or nonhospital facility, is a danger to self or others and is in need of emergency care or treatment for mental illness, and the licensed independent practitioner is not related to the person by blood or marriage, the licensed independent practitioner may do one of the following:

"(a)   Detain the person and cause the person to be admitted or, if the person is already admitted, cause the person to be retained in a hospital where the licensed independent practitioner has admitting privileges or is on staff.

"(b)   Approve the person for emergency care or treatment at a nonhospital facility approved by the authority."[2]

By its terms, ORS 426.232(1) authorizes the following actions: detaining a person, causing a person to be admitted, or retaining a person in a hospital. As applicable to this case, those actions may be taken by a "licensed independent practitioner" who "believes a person who is brought to a hospital or nonhospital facility * * * is a danger to self or others and is in need of emergency care or treatment for mental illness." Because the decisions to detain, admit, or retain a person at a hospital interfere with that person's personal liberty, the licensed independent practitioner would be unable to take those actions without authorization. In other words, ORS 426.232(1) gives authority to act where none previously existed.

Notably, the text of the statute says nothing about a decision not to detain, admit, or retain—in other words, a decision to release, discharge, or allow to leave.[3] That is

_____

[2] Neither party asserts that subsection (b) applies in this case, so I do not address it in my analysis.

[3] The medical terms used in this litigation do not precisely correlate with the statutory framework that defendants seek to invoke, which creates some confusion for the legal analysis. Specifically, J arrived voluntarily at Unity's Psychiatric Emergency Service (PES) with his mother; however, the record indicates that the PES is a locked unit, and persons who are "triaged" there are not permitted to leave without an evaluation. At that point, J was thus "triaged" at Unity PES, but apparently, the triage was the not equivalent of an admission under ORS 426.232, because the parties agree that Unity never admitted Jacob. That creates confusion, however, because the decision to allow J to leave Unity is

unremarkable. I am unaware that any statutory authority is needed for a licensed independent practitioner to permit a person to exercise their personal liberty to leave a hospital or nonhospital facility, and neither the parties nor the majority point to one. The text of ORS 426.232(1) thus refers *only* to affirmative actions that deprive a person of their personal liberty—detention, retention, or admission to a hospital or nonhospital facility.

I disagree with the majority that ORS 426.232(1)(a) can be read to cover both decisions to detain and not to detain. I specifically find no textual support for the majority's conclusion that "a practitioner evaluating whether a person meets the detention criteria in ORS 426.232(1) is an action 'pursuant to' that statute." 349 Or App at 477.

To reach that decision the majority relies on three propositions. First, the majority concludes that we would have to insert terms into ORS 426.232 to read it in the way that plaintiff suggests. *Id.* at 477-78. But the majority does not indicate what those terms are. Indeed, it is the majority's interpretation that would require the insertion of a term like "release" at the end of the list of possible actions, a phrase such as "not to" before the list of possible actions, or a subsection governing decisions "not to hold," where no such term, phrase, or subsection appears in the text.

Moreover, the primary issue with that part of the majority's opinion is that it immunizes the evaluation process itself when the evaluation is not mentioned in ORS 426.232. It may be that an evaluation is a "condition precedent" to a hold. 349 Or App at 476. But whatever statutory authority authorizes an evaluation, it is not ORS 426.232, because that statute does not mention evaluations.[4] Thus, an evaluation is not an action "pursuant to" ORS 426.232 and is not covered by immunity. I disagree that we can read an immunity statute as broadly as the majority suggests.

---

characterized as a "discharge," which usually follows an admission. In the end, however, the imprecision in terms does not affect my legal analysis.

[4] By contrast, ORS 426.228(4) specifically imposes a duty on practitioners to evaluate a person that a peace officer brings to a facility, which further suggests that the legislature is aware of the opportunity to explicitly reference evaluations when they choose to do so.

Immunity is an exception to liability that prevents the ability to seek redress for governmental harm. It is just as reasonable to think that under the "plain meaning approach," 349 Or App at 476-77, a person would expect that whatever governmental actions are covered by immunity would be clearly expressed in the statute.

Second, the majority relies on the statutory context, specifically ORS 426.234 and ORS 426.228, to conclude that decisions not to hold are immunized. However, in my view, that statutory context undercuts the majority's conclusion for the simple reason that both statutes explicitly discuss decisions to release someone, whereas ORS 426.232 contains no mention of release decisions, or decisions not to hold someone. ORS 426.228(4) (providing that a person who is not "in need of emergency care or treatment *** may not be retained in custody" and "is to be released *** to the place where the person was taken into custody"); ORS 426.234 (providing that a practitioner "may release" a person from detention if, prior to a hearing, the practitioner determines that person "is not a danger to self or others and is not in need of emergency care"). It is not clear to me how other statutes in the same statutory scheme which explicitly address release permit a conclusion that ORS 426.232—which does not mention release or a decision not to hold—necessarily governs both decisions to detain and not to detain. Indeed, we frequently draw the opposition conclusion in applying our standard methodology of statutory construction. *See State v. Bailey*, 346 Or 551, 562, 213 P3d 1240 (2009) ("[W]hen the legislature includes an express provision in one statute and omits the provision from another related statute, we assume that the omission was deliberate."). Moreover, ORS 426.234 and ORS 426.228 address release after a person has already been detained, admitted, or retained at a hospital or nonhospital facility, *i.e.*, once a decision is already made to deprive someone of their personal liberty.

The most persuasive point the majority makes is that the legislature likely intended to immunize decisions not to hold given the importance of personal liberty in the civil commitment statutory framework. Indeed, I agree with the majority that immunizing decisions to hold but

not those to release, discharge, or permit to leave runs the risk of incentivizing holds in close cases. I also agree with the majority's implicit assertion that Oregon's civil commitment statutory framework, as we have interpreted it, appears in some instances to rank personal liberty higher than the provision of medical care to persons with mental illness. *See, e.g.*, *State v. C. R.*, 216 Or App 395, 400, 173 P3d 836 (2007) ("Medical care for a life-threatening condition is considered a basic need. However, before involuntary commitment is permitted under the governing statutes, the threat to life must be actual, rather than speculative. Thus, the mere apprehension that a person may commit suicide is insufficient for commitment." (Citation omitted.)). Within that framework, any incentive to hold would be an unlikely legislative intent.

But the majority's citation to *State v. J. W. H.*, 202 Or App 526, 534, 123 P3d 370 (2005), for the general proposition that there is a "tension between protecting personal liberty and the provision of medical help to persons with mental illness," 349 Or App at 478-79, does not carry the day in the face of the clear and unambiguous statutory text. And if personal liberty is the paramount concern, it is curious why the legislature would choose to immunize decisions to hold, which by their definition deprive someone of their personal liberty.

Moreover, apart from a general statement, the majority provides no analytical support for such a conclusion. If a general understanding of the importance of personal liberty is to prevail over the unambiguous text in a statutory interpretation analysis, that general understanding would need more persuasive support than the majority presents.[5] In sum, the plain text of ORS 426.232 does not address decisions to discharge, release, or to otherwise allow a person to

---

[5] A general understanding of a legislative priority is even more ambiguous than legislative history, which the Supreme Court has held can rarely overcome the plain meaning of statutory text. *See Gaines*, 346 Or at 172 ("[A] party seeking to overcome seemingly plain and unambiguous text with legislative history has a difficult task before it."). Indeed, "[w]hen the text of a statute is truly capable of having only one meaning, no weight can be given to legislative history that suggests--or even confirms--that legislators intended something different." *Id.* at 173. In my view, the same logic applies here to the weight, or lack thereof, of the asserted legislative priority.

leave, and under our well-established legal framework for interpreting statutes, that is the correct interpretation.

Turning to the immunity statute, ORS 426.335(5), the critical language is the phrase "pursuant to." I agree that "pursuant to" means "in conformance to or agreement with." 349 Or App at 474-75. Having concluded that ORS 426.232 authorizes only decisions to take action that deprives a person of liberty—to hold, admit, or retain—it is apparent that those are the only actions that can be taken "pursuant to" the statute. A decision to allow a person to leave a facility is not a decision to hold, admit, or retain, nor does it deprive a person of personal liberty. A decision to allow someone to leave is therefore not "an action pursuant to" ORS 426.232. And because it is not an "action[] pursuant to" ORS 426.232, immunity under ORS 426.335(5) is unavailable for that decision.[6]

Our decision in *Deming v. Mt. Hood Community Mental Health Center*, 128 Or App 164, 875 P2d 484, *rev den*, 320 Or 131 (1994), does not alter my conclusion. In *Deming*, the plaintiff sued the defendant claiming that the defendant's agent negligently conducted an investigation under ORS 426.074 into whether her uncle was mentally ill. *Id.* at 166. That investigation was required under ORS 426.070(3) after two people filed a notice of mental illness with the defendant concerning the uncle. *Id.* The investigator concluded there was no probable cause to initiate a detention proceeding against the uncle, who thereafter stabbed and injured the plaintiff. *Id.* We rejected the plaintiff's claim that the immunity statute only applied to claims brought by the allegedly mentally ill person and instead concluded that it also applied to third-party claims. *Id.* at 166-67.

But that conclusion does not answer the most important question raised in this case, which is whether

---

[6] In addition, the other statutory actions that ORS 426.335(5) immunizes all involve involuntarily holding a person. *See* ORS 426.228 (establishing peace officers' authority to take a person to a treatment facility); ORS 426.231 (permitting practitioners to hold a person for transportation to a treatment facility); ORS 426.234 (establishing duties of staff after a person is involuntarily placed at a facility); ORS 426.235 (permitting a community mental health program director to transport an involuntarily held person between treatment facilities). In context, then, it is analytically sound to conclude that ORS 426.232 also addresses the actions taken to involuntarily hold a person.

defendants' actions were taken "pursuant to" a statute covered in ORS 426.335. By contrast, in *Deming*, the investigator's actions undoubtably were taken "pursuant to" a covered statute: ORS 426.335(2) specifically immunizes mental health programs from liability for "conducting the investigation under ORS 426.070 and 426.074." Here, by contrast, defendants did not take actions "pursuant to" any covered statute, so the question of whether immunity extends to third-party liability is not at issue.

*Deming* further held that the immunity statute immunized the investigator for the consequences of his investigation. 128 Or App at 168. We reached that conclusion because the duty to investigate was set in an independent statute, ORS 426.074. *Id.* The statutory framework thus already provided immunity for conducting the investigation and, we reasoned that, "[t]he only plausible reason for the separate immunity provision is to insulate the consequences of the required act, rather than the act itself." *Id.* Here, by contrast, there is no separate statute that mandates any action by defendants, and thus, there is no redundancy in immunizing the act of detaining, admitting, or retaining a person.

Likewise, *Cederberg v. Legacy Health*, 2020 WL 5809991 (D Or Sept 28, 2020), does not persuade me to the majority's viewpoint. In *Cederberg*, the federal district court did not engage in a *Gaines* analysis, so its persuasive value is limited at best. Instead, the district court generally characterized the statutory framework as having "conferred broad immunity to those involved in the unenviable business of deciding whether to hold people against their will for involuntary mental health treatment." *Id.* at *4. It then went on to cite *Deming* for the proposition that

> "The immunity conferred by the statute applies not only to claims brought by a person who was involuntarily held under the statutes, but also to claims brought by third parties 'whom that person injures or damages because the [defendant's] negligen[ce] *** has left the person free to commit the injurious act.'"

*Id.* (citing *Deming*, 128 Or App at 167 (brackets and ellipsis in original)). But as I explained above, the mere fact that a

third party can be immunized from liability does not answer the question as to whether a defendant's actions are covered by ORS 426.335.

The most on-point portion of *Cederberg* is the federal district court's conclusion that the plaintiff's theory of liability necessarily implicated actions taken "pursuant to" a covered statute. 2020 WL 5809991 at *4. The court wrote:

> "Under [the] Plaintiffs' theory, [the] Defendants' inadequate policies and training could only harm the Plaintiffs *through* [the nurse practitioner's] negligent examination of [the allegedly mentally ill person]—an action that was taken 'pursuant to' the involuntary hold statutes. [ORS] 426.335(5)."

*Id.* (emphasis in original).

But ORS 432.232(1) does not authorize or require an "examination"; indeed, that term is not found in the statute at all. And the federal district court did not explain why it viewed "examinations" and "assessments"—actions that are found nowhere in ORS 426.232(1)—to be covered by immunity. In my view, *Cederberg* mirrors errors in the majority opinion in this case by determining what actions are "necessarily" involved in a decision to detain, admit, or retain under ORS 426.232, and expanding the scope of immunity to cover those non-statutory actions.[7]

In sum, I agree that there is a certain logic to the proposition that the statute should govern both decisions to hold and decisions not to hold. But we do not determine the meaning of statues through a general understanding of how

_____

[7] Notably, *Cederberg* cites administrative rules that were promulgated to implement the statute. 2020 WL 5809991 at *4 (citing OAR ch 309, Div 33). But apart from OAR 309-033-0250(3) (establishing standards for hospital and non-hospital holds), the specific administrative rules cited by the federal district court that reference examinations or assessments do not apply in this case because J was never admitted to Unity and no notice of mental illness was filed. *See* OAR 309-033-0250(3) (requiring a "face-to-face examination" after a person is transported to a hospital under a peace officer's hold, prior to initiating a further "hospital hold"); OAR 309-033-0230 (referring to processes that occur after a person is taken into custody, *i.e.*, is being held for transportation to a treatment facility under ORS 426.231); OAR 309-033-0240 (referring to processes that occur after a Notice of Mental Illness is filed with a circuit court). And even with an "examination" referred to in OAR 309-033-0250(3), neither the federal district court nor the majority explains why or how an administrative rule determines the meaning of a statute under the *Gaines* analysis.

a statute should work, or a general concept of what was most likely the legislature's intent. Instead, we follow the framework from *Gaines* and evaluate the text and context of a statute and give legislative history and statutory maxims consideration when appropriate. That analytical pathway produces the legally correct result, even if that result may be unanticipated or perhaps unwanted. Because the text of ORS 426.232 is clear and unambiguous, and because it did not govern defendants' actions here, I would conclude that the trial court erred in granting summary judgment to defendants on the basis of immunity provided in ORS 426.335(5).

I respectfully dissent.